**STEEL HILL DEVELOPMENT, INC.**

v.

**TOWN OF SANBORNTON, a municipal corporation, et al.**

Civ. A. No. 3319.

United States District Court,
D. New Hampshire.

Feb. 17, 1972.

See also D.C., 335 F.Supp. 947.

Stanley M. Brown, McLane, Carleton, Graf, Greene & Brown, Manchester, N. H., for plaintiff.

Peter V. Millham, Wescott, Millham & Dyer, Laconia, N. H., for defendant Town of Sanbornton.

OPINION

BOWNES, District Judge.

In this zoning case, the plaintiff alleges that an amendment to the zoning ordinance of the defendant Town, enacted March 9, 1971, violates the Fifth and Fourteenth Amendments to the Constitution because it constitutes a taking of its property without due process of law and without compensation. Jurisdiction is based on 28 U.S.C. § 1331, and declaratory relief is sought pursuant to 28 U.S.C. § 2201.

Before venturing into the thicket of facts, it is necessary to fix our position by the generally accepted legal principles that apply to zoning cases. The basic guideline was laid down in Euclid v. Ambler Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), in which the Court, in upholding the constitutionality of a zoning ordinance, said:

> If these reasons, thus summarized, do not demonstrate the wisdom or sound policy in all respects of those restrictions which we have indicated as pertinent to the inquiry, at least, the reasons are sufficiently cogent to preclude us from saying, as it must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, mor-

als, or general welfare. At page 395, 47 S.Ct. at page 121.

This principle was reiterated in Gorieb v. Fox, 274 U.S. 603, 47 S.Ct. 675, 71 L.Ed. 1228 (1927):

> State legislatures and city councils, who deal with the situation from a practical standpoint, are better qualified than the courts to determine the necessity, character, and degree of regulation which these new and perplexing conditions require; and their conclusions should not be disturbed by the courts unless clearly arbitrary and unreasonable. At page 608, 47 S.Ct. at page 677.

In a recent federal case, the Eighth Circuit Court of Appeals noted:

> Fairly debatable questions as to the reasonableness, wisdom and propriety of an ordinance are not for the detertermination of the courts but for that of the legislative body on which rests the duty and responsibility of the decision. City of St. Paul v. Chicago, St. Paul, Minneapolis and Omaha Railway Co., 413 F.2d 762, 767 (8th Cir. 1969).

A Federal Court when asked to declare a state or local ordinance unconstitutional must heed the admonition of Justice Black in Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963):

> Legislative bodies have broad scope to experiment with economic problems, and this Court does not sit to "subject the State to an intolerable supervision hostile to the basic principles of our Government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to secure." [Quoting Sproles v. Binford, 286 U.S. 374, 388, 52 S.Ct. 581, 76 L.Ed. 1167 (1932)].

The plaintiff has the burden of proving that the Sanbornton zoning change was clearly unreasonable and arbitrary. McMahon v. City of Dubuque, Iowa, 255

F.2d 154, 159 (8th Cir. 1958); Bosse v. City of Portsmouth, 107 N.H. 523, 226 A.2d 99 (1968); Schadlick v. City of Concord, 108 N.H. 319, 234 A.2d 523 (1967).

This case reflects the current clash between those interested in opening up new and hitherto undeveloped land for sale and profit and those wishing to preserve the rural character of Northern New England and shield it from the relentless pressure of an affluent segment of our society seeking new areas for rest, recreation and year round living.[1] The Town of Sanbornton has a year round population of 1,000 with about 330 regular homes, and a summer population of double that with approximately 400 seasonal homes. It is about 100 miles north of Boston and lies astride one of the main Interstate Highways from Boston to Northern New England, Interstate 93. It is located in the Lakes Region of New Hampshire, bordering Lake Winnisquam and within easy reach of Lake Winnipesaukee, both of which are large, attractive, and extensively used recreational lakes. Its location also affords easy access to most of the major ski areas of New Hampshire.

The zoning change enacted in March of 1971 increased the minimum lot size of plaintiff's property from 35,000 square feet to three acres and six acres. The Town had enacted a zoning ordinance on March 13, 1965, pursuant to New Hampshire Revised Statutes Annotated, Chapter 31:60–89. During 1970 and until March 9, 1971, the zoning provisions in effect provided that the Town be divided into districts with minimum lot sizes as follows:

| | |
|---|---|
| General Residence and Agricultural | 35,000 square feet |
| Commercial District | - - - |
| Recreational District | 15,000 square feet |
| Highway Commercial | 35,000 square feet |
| Historical Preservation | - - - |
| Forest Conservation | 6 Acres (261,360 square feet) |

1. Kovach, New Hampshire, A Booming Vacationland, Fights to Preserve Its Natural Beauty, New York Times, Feb. 1, 1971, at 15.

The amendments enacted in March of 1971 enlarged the Forest Conservation area and the General Agricultural area and changed the minimum lot sizes as follows:

| | |
|---|---|
| General Residence | 1½ Acres |
| General Agricultural | 3 Acres |
| Recreational | 1½ Acres |
| Historical Preservation | 1½ Acres |
| Forest Conservation | 6 Acres |

Plaintiff is the owner of a single tract of land of about 510 acres which includes an Inn, Golf Course, Guest Cottages, and a few other buildings. Prior to 1971, all of the plaintiff's land was in the General Residence and Agricultural District with a minimum lot size of 35,000 square feet. As a result of the 1971 zoning change, all of the plaintiff's land was included in the Forest Conservation District with a minimum lot size of six acres, except for that portion lying 600 feet on either side of Steel Hill Road which is in the General Agricultural District with a minimum lot size of three acres. A fair estimate would be that 70% of the plaintiff's land is now zoned in the Forest Conservation District and approximately 30% in the three acre Agricultural District.

The plaintiff corporation was formed in November or December of 1965, and the property in question was purchased on December 23, 1969, for $290,000. Mr. Pepe, the moving figure behind the corporation, had extensive experience as a developer in Connecticut. He testified that the amount paid for the property was "a fair price." There is no doubt that the plaintiff corporation was formed and the purchase made with the intent of subdividing the property and selling house lots. The prior owner had started a survey of the land in September of 1969, and part of the property had been subdivided into thirty-five lots. Two or three lots had purchase deposits on them. As soon as the plaintiff became the owner of the property, it scrapped the survey and partial development, returned the purchase deposits, and instituted a new plan of development based on the so-called "cluster concept." This concept combined individual homesites on lots of 25,000 square feet or more with homesites grouped in clusters of three to fifteen sites on lots of approximately 12,000 square feet. The cluster sites were to have common land to equal or exceed 35,000 square feet. According to the plaintiff, the cluster would result in the best use of the area and preserve as much of the woodland as possible. Ex. 10. The plaintiff also estimated that development pursuant to the cluster concept rather than along conventional lines would result in increased profits of about $500,000. Ex. 13 and 14.

Pepe and his subordinates knew that development of the plaintiff's property in accord with the cluster concept would require an amendment to the zoning ordinance.[2] In Mr. Pepe's own words, he took "a calculated risk" in basing his development plans on the cluster concept. Meetings were, therefore, scheduled with the Planning Board as part of "an educating and selling process." *Testimony of Forristall*. At the first meeting with the Board, the cluster concept was explained and the Board was also shown a plan of how the property could be developed as a trailer park and also a plan showing how the property could be developed under a conventional plan. It is fair to find that the plaintiff never intended to develop the property as a trailer park and that the plan was a tactical gambit used in the "education and selling process." As far as the conventional plan is concerned, I find that the plaintiff probably intended to use that as a last resort if the cluster concept was not approved. Although the Board was never given any accurate estimate of the number of units in the "Town House" cluster areas, it was made clear to them that the plan would provide for 500 to 515 family units. Meetings between the Board and representatives of the plaintiff continued through the summer, fall,

2. Since Sanbornton is a Town, this requires a majority vote of those residents of the Town present and voting at the Town Meeting. NH RSA 31:63-a.

and winter of 1970. A hint of what was to come was an amendment to the zoning law passed on July 20, 1970, providing for two Forest Conservation Areas with minimum lot sizes of six acres. A careful reading of the Planning Board minutes of 1970, Ex. 34, reveals that the Board did consider the plaintiff's proposed plans very carefully and in the beginning were favorably impressed by them. In the words of the secretary, the Board "gave cluster zoning quite a study." The Board minutes and the testimony of Marion Atwood, Secretary, and Mr. Livingstone, Chairman, also show that the Board was concerned about the orderly growth of the Town. Although they did not hire experts to assist them, since such experts were presumably furnished by the plaintiff they did carefully consider the problems of slope drainage, soil conditions, sewage disposal, traffic, access roads, and potential pollution of Lake Winnisquam and came to the conclusion that there were many objections to the cluster plan development.

Public opposition to the cluster plan began to build in August of 1970, and the Board meeting of August 10, 1970, reflects this:

> The Board admitted that Cluster Zoning seemed to fit the needs but felt that getting this opinion would not be easily acceptable to the voters of the town who have the vote on the matter.

The minutes of the meetings of September 3, September 24, November 13, December 22, 1970, and January 29, 1971, all reflect growing opposition by the townspeople to the plaintiff's proposed plan of development. It is true, as the plaintiff contends, that the Planning Board in the fall of 1970 began to pay more attention to the townspeople opposing the plan than to plaintiff's studied and continued efforts to have the Board accept its concept. Since, under a town meeting form of government, the people of the town constitute the legislative body, this was to be expected and antici-

pated. In fact, it is part of the democratic process.

There is no doubt that some members of the Board, and a good number of the townspeople, were interested in discouraging population density in this area and were generally determined to try to keep the Town as rural as possible.[3] *Testimony of Livingstone and Atwood.* The Chairman of the Planning Board testified: "93 [Interstate 93] has a bearing on this."

On February 2, 1971, the Planning Board voted three to two to recommend that three zoning amendments be put before the Annual Town Meeting in March for approval. These amendments provided for enlarging the Forest Conservation Areas, the establishment of separate General Residence Districts and Agricultural Districts, requiring a minimum lot size of one and one-half acres and 175' frontage in the Historical Preservation District, and requiring a minimum lot size of one and one-half acres and 175' frontage in the Recreational District. The plaintiff's land all fell within the enlarged Forest Conservation Area (about 70%) and the new General Residence District and Agricultural District (about 30%). While this was by no means spot zoning, it was an emphatic rejection of the cluster zoning plan sought by the plaintiff. The townspeople voted in favor of the three amendments by a little more than two to one.

Plaintiff's attack on the unreasonableness of the six and three acre lot size requirements resulted in a great deal of evidence concerning the topography and soil conditions of the plaintiff's land. As might be expected, there was a sharp conflict between the experts as to lot sizes reasonably necessary to avoid problems of pollution, improper sewage disposal, poor drainage, and erosion. It must be stressed that my function is not to determine what the zoning ordinance for the Town of Sanbornton ought to provide, but to decide whether the

---

3. The Preamble to the Town Zoning Ordinance states as one of its purposes "by

preserving the rural charm now attached to our town." Ex. 45.

amendments adopted are so clearly arbitrary and unreasonable as to deprive the plaintiff of constitutionally protected rights.[4]

Most of the area is characterized by Paxton and Shapleigh-Gloucester soils. Paxton soils consist of well drained loamy soils formed in stony glacial till. There is a hard layer called fragipan at about twenty-two inches below the surface which has very slow permeability. The Shapleigh-Gloucester soils are a combination of a rocky rapidly permeable soil (Shapleigh) and a well drained droughty soil (Gloucester). About 70% of the Shapleigh-Gloucester soils are shallow above a layer of ledge or bedrock. The bedrock runs in an undulating layer under the surface and the layer, at places, is completely exposed. Both the Paxton soils and the Shapleigh-Gloucester soils are rated severe for septic tanks and present problems of proper sewage drainage because the effluent cannot penetrate the bedrock and will tend to flow along the surface of the fragipan rather than being absorbed by it. Ex. 55 (Belknap County Soil Survey) and *Testimony of Lyon*. This problem can be overcome, however, by proper construction and location of septic tanks and leaching beds and the use of curtain drains where necessary. Such methods, however, assume that there will be the necessary supervision and control during the building process. *Testimony of Sherman.*

Three sets of percolation tests were made to determine the permeability of the soil. The first (Turner tests) were done by inserting an auger into the soil and drilling into it, and the other two used a back hoe for excavating the holes. If the Turner tests are valid, then they show that 70% of the lots would have to have leaching fields built up over the surface of the land. *Testimony of Scott.* It is probable, however, that the back hoe tests are a more accurate measurement of the soil permeability. Mr. Eckloff, Director of the Division of Subsoil Sewage Disposal for the State, was of the opinion, based on his examination of the site, that if a community water supply was provided as the plaintiff included in its proposed plan, a lot area of 20,000 to 30,000 square feet would insure adequate sewage disposal. Mr. Lyon, on the other hand, Soil Conservationist for the United States Soil Service, was of the opinion that proper sewage drainage required lots greatly in excess of 35,000 square feet.

All experts agreed that bulldozing, clearing, and building roads would cause some erosion. The plaintiff's experts belittled the problem and the defendant's witnesses viewed it with alarm.

It is fair to find, without going into detail, that the contours of the property varies from sloping to hilly to steep hilly to clifflike with most of it ranging from hilly to steep hilly. It is obvious that building houses on slopes and hills present problems of drainage and erosion that do not occur on level land. It is also clear that proper methods of construction can reduce the problems. But here again, we have to assume supervision and control during the building process and the record of present day developers is not one to inspire confidence.

If I were to decide this case based solely on the question of whether the lot sizes were reasonably necessary from the standpoint of health and safety, I would find that the three acre minimum provided adequate insurance for the problems of sewage disposal and drainage that are inevitable in this type of soil and that the six acre minimum was not reasonably necessary. But health and safety are not the only standards. The Zoning Enabling Act, New Hampshire

4. In LaSalle National Bank of Chicago v. City of Chicago, 5 Ill.2d 344, 125 N.E.2d 609 (1955), the court said at page 612: However, where there is room for a legitimate difference of opinion concerning the reasonableness of a particular ordinance, or where the question of reasonableness is fairly debatable, the courts will not interfere with the judgment of the legislative body.

Revised Statutes Annotated, Chapter 31:60, specifically provides:

> For the purpose of promoting health, safety, morals, *or the general welfare of the community*. . . . [Emphasis added.]

The test in New Hampshire is well set forth in Rockingham Hotel Co. v. North Hampton, 101 N.H. 441 (1958), at page 444, 146 A.2d 253 at page 255:

> We cannot say that the provisions in question have no rational tendency to promote the safety and general welfare of the community or to conserve property values throughout the municipality.

There was a genuine concern by the Planning Board and the townspeople about the problem of pollution of Lake Winnisquam. A good section of this area drains into Black Brook which, in turn, flows into Lake Winnisquam. I take judicial notice of the fact that Black Brook is the main spawning grounds for smelt that not only attract fishermen in the spring to Lake Winnisquam, but which also furnish food for the lake trout for which Lake Winnisquam is famous. I must also recognize that Lake Winnisquam, like most other large New Hampshire lakes, is engaged in a continual battle against pollution.

The people of Sanbornton had a legitimate interest in considering the traffic problems that would be caused by this development, not only on the main road to the development, but at the junction of lower Bay Road and Route 3. Communities all over the country are wrestling with the problems caused by greatly accelerated increases in automobile traffic. These, we know now, include not only the long accepted hazards to life and limb, but also the recently recognized danger of pollution of the atmosphere. And we are also beginning to realize that the answer to these problems is not to build more new roads and widen existing roads. That only compounds the problem. In Keene v. Blood, 101 N.H. 466,

469, 146 A.2d 262, 264 (1958), the New Hampshire Supreme Court held:

> Zoning regulations, to be effective, both in theory and in practice, must be enacted and enforced with a view to the future needs as well as the present condition of the municipality.

The people of Sanbornton have a right to try to protect themselves against the ugly suburban sprawl that has become part of the great megalopolis running from Washington, D. C. to Portland, Maine. In upholding a five acre minimum lot size, the Court in County Commissioners of Queen Anne's County v. Miles, 246 Md. 355, 369, 228 A.2d 450, 457 (1967), said:

> On the other hand, if the ordinance has a substantial relationship to the general welfare of the community in that it can fairly be taken as a reasonable effort to plan for the future within the framework of the County's economic and social life, it is not unconstitutional because under it some persons may suffer loss and others be benefited.

It is important to stress here that there was no evidence that the new zoning law was prompted by discrimination of any sort. Nor was there any showing of population pressures directly or indirectly impinging on the town. There is no evidence that the amendments constitute either snob zoning or exclusionary zoning.[5] Sanbornton is not in the same position as Easttown Township in the case of National Land and Investment Co. v. Kohn, 419 Pa. 504, 215 A.2d 597 (1966), upon which the plaintiff relies heavily. In that case the Court held a four acre minimum lot size requirement unconstitutional where "[t]he township finds itself in the path of a population expansion approaching from two directions." At page 605. The only need shown for this development is that it will profit the developer.

Zoning is never permanent. Indeed it cannot be, for it has to meet the chang-

5. Note, Exclusionary Zoning and Equal Protection, 84 Harv.L.Rev. 1645 (1971).

ing needs of the community. Edgewood Civic Club v. Blaisdell, 95 N.H. 244, 61 A.2d 517 (1948). This is exactly what the Town tried to do in enacting these amendments. In the minutes of the Planning Board meeting of January 29, 1971, it is stated:

> All members present and about 30 townspeople. They are showing a remarkable interest in remaking our zoning ordinance in line with changing times. Ex. 34.

See also the Annual Report of the Chairman of the Planning Board. Ex. 44. All that is needed to amend the zoning ordinance is a majority vote at any legally called Town Meeting. If the zoning laws of a town do become permanent barriers of exclusion and discrimination, there can always be resort to the courts.

One of the pressing needs of our times is for open spaces and green areas and a community such as Sanbornton, whose population doubles in the summer, must take into account that one of its attractions as a recreation community is the amount of forest land and relatively undeveloped areas in the Town. David Scott, the Executive Director of the Lakes Region Planning Commission, pointed out that the density problem is a critical factor. Lake Winnisquam is one of the most important assets of the Town and the entire region. It has now become distressingly clear that the impact of too many people too fast with the inevitable side effects can destroy a town as a recreational and rural community.[6]

But I recognize that, while a town may defend itself against the onslaught of those seeking space for play and recreation, it cannot do so by taking the property of private individuals without compensation. The plaintiff suggests

that six acre minimum lot requirement in itself is confiscatory. The constitutionality of multiacre zoning has in many cases been upheld.[7] Mr. Evans, a planning consultant and former Director of Economic Development for the State of New Hampshire, testified that the present trend is towards much larger lots and five acre lot developments are now being planned in New Hampshire. It is my opinion that the proper test is not just the size of the lot, but a balancing of the public objectives promoted by the zoning restriction and the economic burden imposed on the owner of the restricted land. The land of the plaintiff has not been destroyed. It can be used for year round and seasonal residences. It can be used for general farming and agricultural enterprises. See Article 18 of the Zoning Ordinance, Ex. 45. It is true that the change in zoning depresses the immediate sale value of the property for the purpose the plaintiff intended. But that is not the test. An application of zoning which even substantially reduces the value of land, but does not cause a total loss of profitable use is normally upheld as not confiscatory. In Euclid v. Ambler Co., *supra*, there was a 75% alleged loss. In Hadacheck v. Sebastian, 239 U.S. 394, 405, 36 S.Ct. 143, 60 L.Ed. 348 (1915), a 93% alleged loss was not found unconstitutional. The Sixth Circuit Court of Appeals in City of Ann Arbor, Mich. v. Northwest Park Construction Corp., 280 F.2d 212 (6th Cir. 1960), upheld a zoning amendment that changed the property from commercial to residential despite the fact that the Northwest Corporation had vast plans for commercial development, including a shopping center. It is ironic, and must be particularly frustrating to the plaintiff, that it started this change in zoning to allow a more intensive de-

---

6. Note, Protection of Environmental Quality in Non-Metropolitan Regions By Limiting Development, 57 Iowa L.Rev. 1 (1971).

7. See 95 A.L.R.2d starting at page 712 for a comprehensive annotation on the validity of zoning regulations prescribing a minimum area for house lots.

Senior v. Zoning Commission of Town of New Canaan, 146 Conn. 531, 153 A.2d 415 (1959), upheld amendments that upgraded a residential zone from two to four acres. Fischer v. Bedminster Tp., 11 N.J. 194, 93 A.2d 378 (1952) upheld the validity of five acre lots.

velopment of the land. But while the opposite result from what it intended has occurred, its land has not been destroyed or confiscated. The present market for the sale of lots has been diminished, but this is not nearly the catastrophe that occurs when a superhighway goes next to, without touching, a person's land and, under the hoary doctrine of "no touching - no taking," the land is destroyed or at least mutilated without compensation. The plaintiff still has the land and buildings for which it paid a fair price of $290,000. The plaintiff certainly acquired no vested interest in the original 35,000 square foot minimum zone because of its abortive effort to change the zoning law. It cannot be found that the change in the zoning ordinance has resulted in a confiscatory taking of the plaintiff's land. Sibson et al. v. State of New Hampshire, N.H., 282 A.2d 664.

Under all of the facts, I do not find that the zoning amendments enacted by the Town of Sanbornton at its Town Meeting in March of 1971, were so arbitrary or unreasonable as to deprive the plaintiff of any rights guaranteed under the United States Constitution.

Judgment for the defendant.

So ordered.