**STEEL HILL DEVELOPMENT, INC., Plaintiff, Appellant,**

v.

**TOWN OF SANBORNTON et al., Defendants, Appellees.**

No. 72-1234.

United States Court of Appeals, First Circuit.

Heard Oct. 5, 1972.

Decided Nov. 24, 1972.

Peter B. Rotch, Manchester, N. H., with whom McLane, Carleton, Graf, Greene & Brown and Stanley M. Brown, Manchester, N. H., were on brief, for appellant.

Peter V. Millham, Laconia, N. H., with whom Wescott, Millham & Dyer, Laconia, N. H., was on brief, for appellees.

Before COFFIN, Chief Judge, ALDRICH and McENTEE, Circuit Judges.

COFFIN, Chief Judge.

Located in the rolling hills of Belknap County, New Hampshire is the tiny town of Sanbornton with a year-round population of approximately 1,000 persons living in some 330 regular homes. Long popular as a major recreational and resort area, Belknap County commenced to share its rural beauty with visitors in considerably greater degree with the opening in the 1960's of Interstate Highway 93 which funneled droves of touring urbanites from the Boston area, one hundred miles away, into towns like Sanbornton. Since Sanbornton borders Lake Winnisquam, is within easy reach of Lake Winnipesaukee and affords simple access to most New Hampshire ski areas, it is no surprise that its summer population is about 2,000 persons, that it has around 400 seasonal homes, and now is afforded the unique opportunity to serve as a seasonal second home paradise for persons who would buy the proposed 500 to 515 family units planned by appellant Steel Hill Development, Inc. In short, as the district court stated, "this case reflects the current clash between those interested in opening up new and hitherto undeveloped land for sale and profit and those wishing to preserve the rural character of Northern New England and shield it from the relentless pressure of an affluent segment of our society seeking new areas for rest, recreation and year round living." Steel Hill Development, Inc. v. Town of Sanbornton, 338 F.Supp. 301, 302 (D.N.H.1972).

Steel Hill acquired its 510 acres in December 1969 and immediately began surveying the land, mapping the topography and creating plans for conventional and "cluster" development.[1] At that time, and until March 9, 1971 the entire Steel Hill tract was zoned as General Residence and Agricultural, requiring a minimum lot size of 35,000 square feet, or about three-fourths of an acre.[2] Desirous of effectuating the "cluster" plan which appellant knew would require amending the zoning ordinance, appellant engaged in extensive and cordial negotiations with the town planning board during 1970. In order to permit some development while the "cluster" concept was under consideration, the board accepted a plan for 50 conventional lots meeting the 35,000 square feet requirement and scheduled, according to usual practice, a public hearing on the matter. About one hundred townsfolk attending

---

[1] "Cluster" zoning modifies lot size and frontage requirements upon certain conditions involving setting aside of land by the developer for parks, schools, or other public needs. See 1 E. Yokley, Zoning Law and Practice § 4-25, at 182-183 (3d ed. 1965).

[2] The town's first zoning plan, embodying this requirement, was adopted on March 13, 1956 pursuant to N.H. R.S.A. ch. 31:-60-89.

the meeting on November 13, 1970 expressed opposition to any development by Steel Hill. Nevertheless, the planning board later approved the subdivision plan for thirty-seven lots, in the face of a petition, presented by about thirty town residents, for zoning the entire town as six acre minimum lots. Because public interest had been heightened in preserving Sanbornton's "charm as a New England small town", the planning board then proposed amendments to the zoning ordinance designed to enlarge the Forest Conservation areas,[3] and to establish separate General Residential Districts and Agricultural Districts, with increased minimum acreage requirements in these districts and in the Historical Preservation and the Recreational Districts. These were passed.[4]

As a result of the re-zoning, approximately 70 per cent of appellant's land is in the Forest Conservation District and 30 per cent in the Agricultural District. Clearly, its plans for "cluster" or conventional development are inconsistent with the new zoning ordinance. Appellant filed suit in the district court alleging that the three and six acre minimum lot size requirements are unconstitutional because they bear no rational relationship to the health, safety, morals or general welfare of the community and are therefore violative of N.H. R.S.A.

31:60 and the due process clause of the Fourteenth Amendment; that the rezoning greatly reduced the value of its land so as to constitute a taking without compensation; and that the classification of its land was violative of the equal protection clause of the Fourteenth Amendment because it was arbitrary and discriminatory in the restrictions imposed on development. The district court found adversely to appellant on all counts.

■■ This court, like other federal and state courts throughout the country, finds itself caught up in the environmental revolution. Difficult and novel legal and factual questions are posed which require the resolution of conflicting economic, environmental, and human values. The problem inherent in quantifying a "way of life", Ely v. Velde, 451 F.2d 1130 (4th Cir. 1971), or the beauty of an unspoiled mountain, Scenic Hudson Preservation Conference v. F. P. C., 354 F.2d 608 (2d Cir. 1965), may never be solvable with any degree of certitude. Thus basic value judgments will be made by legislatures and voters which courts can review in most instances not on the basis of the wisdom of these decisions, but rather only to determine whether they are permissible within the relevant statutory and constitutional framework. It was with these principles in mind

---

3. These areas were first established by the town voters in July 1970 as an amendment to the zoning ordinance, and required minimum six acre lots in remote sections of the town.

4. Comparison of the zoning ordinances before and after the March 1971 approval by the townspeople of these amendments indicates:

MINIMUM LOT SIZES

| | Pre-March 1971 | Post-March 1971 |
|---|---|---|
| General Residential & Agricultural | 35,000 sq. ft. | General Residential 1½ acres (65,340 sq. ft.)<br>General Agricultural 3 acres (130,680 sq. ft.) |
| Commercial | ——— | ——— |
| Recreational | 15,000 sq. ft. | 1½ acres (65,340 sq. ft.) |
| Highway Commercial | 35,000 sq. ft. | 35,000 sq. ft. |
| Historical Preservation | ——— | 1½ acres (65,340 sq. ft.) |
| Forest Conservation | 6 acres | 6 acres (261,360 sq. ft.) |

that the district court tried the case, and we will not set aside its decision unless its findings of fact were clearly erroneous, United States v. Marshall, 391 F.2d 880 (1st Cir. 1968), Leach v. Crucible Center Co., 388 F.2d 176 (1st Cir. 1968), or unless there was an error of law.

■ New Hampshire, like most states, has granted authority to localities to zone in order to promote public health, safety, morals and general welfare. N.H. R.S.A. 31:60. A zoning ordinance under such a statute may not be declared unconstitutional unless its "provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S. Ct. 114, 71 L.Ed. 303 (1926); Gorieb v. Fox, 274 U.S. 603, 47 S.Ct. 675, 71 L.Ed. 1228 (1927). Thus a court does not sit as a super zoning board with power to act *de novo*, but rather has, in the absence of alleged racial or economic discrimination,[5] a limited role of review.

The district court found that, as the Sanbornton Planning Board had itself determined, topography and soil conditions posed severe problems of pollution, improper sewage disposal, poor drainage and erosion to large-scale development of the Steel Hill tract, justifying imposition of the three-acre minimum lot size requirement in accordance with the public health. We have carefully read the conflicting trial testimony of the various experts who expressed an opinion on these matters and cannot say that the court's finding is clearly erroneous. In any event, appellant does not seem to challenge that ruling, but rather directs its argument to the unreasonableness of the six acre lot requirement.

The district court stated that it could not find the six acre requirement reasonable if only health and safety were considered, but that such requirement was reasonably related to the promotion of the general welfare of the community. N.H. R.S.A. ch. 31:60. The court considered the pollution of Lake Winnisquam, possible interference with smelt spawning in Black Brook, increased traffic problems inherent in large-scale development, and increased air pollution. Testimony of Planning Board members and citizens opposed to Steel Hill's plans additionally reveals a desire to discourage density of population, and most importantly, a fear of premature development which was manifested in this effort to provide for orderly growth of the unspoiled areas of the town in a logical way. Several witnesses testified that not only would the town's rural character be destroyed by Steel Hill's massive plans, which would, in effect, double the town's population, but that there could be immeasurable ecological harm.

Appellant relies heavily on National Land and Investment Co. v. Kohn, 419 Pa. 504, 215 A.2d 597 (1965); Appeal of Kit-Mar Builders, 439 Pa. 466, 268 A.2d 765 (1970), and Board of County Supervisors of Fairfax County v. Carper, 200 Va. 653, 107 S.E.2d 390 (1959)[6] for the proposition that Sanbornton may not use a zoning ordinance to avoid "the increased responsibilities and economic burdens which time and natural growth invariably bring." *Kohn, supra,* 215 A.2d at 610. Other cases which support this view include Appeal of Girsh, 437 Pa. 237, 263 A.2d 395 (1970); Norbeck Village Joint Venture v. Montgomery County Council, 254 Md. 59, 254 A.2d 700 (1969); and *Oakwood at Madison.* This proposition, in-

---

5. Cases concerned with such exclusionary zoning are not important to our inquiry. *Cf.* Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917); Oakwood at Madison, Inc. v. Township of Madison, 117 N.J.Super. 11, 283 A.2d 353 (1971); English v. Town of Huntington, 335 F.Supp. 1369 (E.D.N.Y.1972).

6. *Kohn* invalidated a four acre minimum lot size requirement in the Philadelphia suburbs; *Kit-Mar* invalidated three and four acre requirements also in the Philadelphia suburbs; *Carper* invalidated a two acre requirement in the western two thirds of Fairfax County in the Washington, D.C. suburbs, at that time the fastest growing county in the United States.

vulnerable in its cloak of generality, does not quite suit the present case. All these cases refer to an unnatural limiting of suburban expansion into towns in the path of population growth where a too restrictive view of the general welfare was taken. Comment, 50 Journal of Urban Law 129 (1972). Instead, appellant here does not seek to satisfy an already existing demand for suburban expansion, but rather seeks to create a demand in Sanbornton on behalf of wealthy residents of Megalopolis who might be willing to invest heavily in time and money to gain their own haven in bucolic surroundings. Note, 57 Iowa L.Rev. 126, 127 (1972). These different problems of suburban and rural expansion, their scientific and legal analyses, and their appropriate solutions cannot so easily be equated.

More appropriate to appellant's argument, and not cited to us, is Kavanewsky v. Zoning Board of Appeals of Town of Warren, 160 Conn. 397, 279 A.2d 567 (1971), where the town, when threatened with rapid development, increased minimum lot size requirements from one to two acres, an increase which the court found motivated by a "demand of the people to keep Warren a rural community with open spaces and keep undesirable businesses out", *id.* at 570, a goal not within the general welfare. In contrast, perhaps, is Confederacion de la Raza Unida v. City of Morgan Hill, 324 F. Supp. 895 (N.D.Cal.1971), which permitted a restriction, imposed by a zoning ordinance, on the development of a charming mountainous area of a city because of esthetic and environmental concerns. Yet even *Kavanewsky*, so far as appears, was dealing with an effort to keep out permanent residents and businesses, not to damp down a promoter's goal of doubling the housing in a small town by its large-scale second home plans. If, however, appellant has failed to present us with any controlling authority, neither have appellees. *Morgan Hill* involved a more detailed ordinance

regulating density which resulted in a minimum lot size of only one half acre on the average. County Commissioners of Queen Anne's County v. Miles, 246 Md. 355, 228 A.2d 450 (1967), involved the upholding of a five acre minimum lot size requirement. The affected land comprised only 6.7 per cent of the county and the zoning was done pursuant to a long-range plan to preserve an unusually beautiful country estate section of a river. While we note that it is not within judicial competence to say that the forests in Sanbornton are any less worth preserving than country river estates, we do find it significant that the six acre requirement extends to approximately 50 per cent of the town, including the only area currently under any sort of development.

In short, no precedent compels its application to the case before us. We are faced with "a local legislative determination that the general welfare will be promoted by exclusion of an unwanted use from a non-metropolitan community [which exclusion] is not likely to conflict with a regional need for local space for that use." 57 Iowa L.Rev. at 140. We recognize, as within the general welfare, concerns relating to the construction and integration of hundreds of new homes which would have an irreversible effect on the area's ecological balance, destroy scenic values, decrease open space, significantly change the rural character of this small town, pose substantial financial burdens on the town for police, fire, sewer, and road service, and open the way for the tides of weekend "visitors" who would own second homes. If the federal government itself has thought these concerns to be within the general welfare, *see, e. g.,* 42 U.S.C. § 4321, et seq., we cannot say that Sanbornton cannot similarly consider such values and reflect them in its zoning ordinance. Though some courts may have rejected them within the suburban zoning context, as in *Kohn,* and its progeny,[7] or where permanent

7. The rejection was far from unanimously supported Two of seven Justices dissented in *Kohn,* and *Kit-Mar* and *Girsh* were both decided by four-to-three votes.

first homes are involved, as in *Kava-newsky, but cf. Morgan Hill*, we think they are persuasive in the case before us. "Many environmental and social values are involved in a determination of how land would best be used in the public interest. The choice of the voters of [the city] is not lacking in support in this regard." Southern Alameda Spanish Speaking Organization v. City of Union City, 424 F.2d 291 (9th Cir. 1970).[8]

■ Yet, though it may be proper for Sanbornton to consider the foregoing factors, we think the town has done so in a most crude manner. We are disturbed by the admission here that there was never any professional or scientific study made as to why six, rather than four or eight, acres was reasonable to protect the values cherished by the people of Sanbornton. On reviewing the record, we have serious worries whether the basic motivation of the town meeting was not simply to keep outsiders, provided they wished to come in quantity, out of the town. We cannot think that expansion of population, even a very substantial one, seasonal or permanent, is by itself a legitimate basis for permissible objection. Were we to adjudicate this as a restriction for all time, and were the evidence of pressure from land-deprived and land-seeking outsiders more real, we might well come to a different conclusion. Where there is natural population growth it has to go somewhere, unwelcome as it may be, and in that case we do not think it should be channelled by the happenstance of what town gets its veto in first. But, at this time of uncertainty as to the right balance between ecological and population pressures, we cannot help but feel that the town's ordinance, which severely restricts development, may properly stand for the present as a legitimate stop-gap measure.

See the dissent of Mr. Justice Jones in *Girsh*.

8. This case upheld a public referendum which resulted in a prohibition of the

In effect, the town has bought time for its citizens not unlike the action taken in referendum by the City of Boulder, Colorado to restrict growth on an emergency basis until an adequate study can be made of future needs. 60 Georgetown L.J. 1363 (1972). *See also* Golden v. Planning Board of Town of Ramapo, 30 N.Y.2d 359, 334 N.Y.S.2d 138, 285 N.E.2d 291 (1972), appeal dismissed 409 U.S. 1003, 93 S.Ct. 440, 34 L. Ed.2d 294 (1972). It was evident to the zoning board, and the district court, that haphazard and uncontrolled development of the town's hill areas would be inimical to present and future Sanbornton residents, *see* Candlestick Properties, Inc. v. San Francisco Bay Conservation & Development Comm., 11 Cal.App.3d 557, 89 Cal.Rptr. 897 (1970), and that if the zoning laws do become "permanent barriers", then as the district court said, resort to the courts is always possible. *Steel Hill Development, supra,* 338 F. Supp. at 307. The zoning ordinance here in question has been in existence less than two years. Hopefully, Sanbornton has begun or soon will begin to plan with more precision for the future, taking advantage of numerous federal or state grants for which it might qualify. Additionally, the New Hampshire legislature, to the extent it expects small towns like Sanbornton to cope with environmental problems posed by private developments, might adopt legislation similar to the federal National Environmental Policy Act, 42 U.S.C. § 4321 et seq., and thereby require developers to submit detailed environmental statements, if such power does not already reside within the town's arsenal of laws. Thus, while we affirm the district court's determination at the present time, we recognize that this is a very special case which cannot be read as evidencing a general approval of six-acre zoning, and that this requirement may well not indefinitely stand without more homework by the concerned parties.

construction of low and moderate income housing on a tract of land previously zoned agricultural. Insofar as it does not concern minimum lot size requirements it is of no avail to appellees.

Lastly, we find little merit to appellant's contentions that the zoning ordinance has resulted in a taking of appellant's property without just compensation or that it is discriminatory. As the district court found, appellant still has the land and buildings for which it paid $290,000. The estimated worth, had Steel Hill's original plans been approved, is irrelevant. Though the value of the tract has been decreased considerably, it is not worthless or useless so as to constitute a taking. Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915); Sibson v. State, N. H., 282 A.2d 664 (1971). *Cf.* State v. Johnson, 265 A.2d 711 (Me.1970); Bartlett v. Zoning Comm. of Town of Old Lyme, 161 Conn. 24, 282 A.2d 907 (1971). As to appellant's claim of discrimination, we note that its land, like all other land zoned six acres, is essentially virgin forest. It is adjacent to, and its March 1971 re-zoning represented an extension of, the Forest Conservation District created in 1970. Thus the ordinance cannot be said to discriminate unreasonably against Steel Hill, be it the only developer in the town.

Affirmed.