300 A.2d 465.

TOWN OF GLOCESTER *vs.* OLIVO'S MOBILE HOME COURT, INC.

FEBRUARY 12, 1973.

PRESENT: Roberts, C.J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. The defendant corporation is the owner and operator of a mobile home park located in the town of Glocester on land which is situated on the easterly side of Chopmist Hill Road just north of the junction of that highway and Pound Road. The parcel contains approximately 38 acres. In this action, the town seeks to enjoin the corporation from violating a provision found in both its licensing and zoning ordinances[1] which limits the number of mobile homes that can be parked in such a facility to 30. The defendant filed an answer which in essence challenges the constitutionality of the 30-unit limitation and asked that the town be restrained from interfering with "its right" to operate a mobile home park containing more than 30 units. A hearing was held before a justice of the Superior Court. The trial justice, in upholding the limitation, alluded to the public health problems which are not found in "conventional habitation." Judgment was entered ordering the defendant to reduce the number of units parked on its premises to 30 and to obtain the requisite license. This appeal ensued and to put it in its proper focus, we will set out just a few of the pertinent facts found in the record.

Mobile homes first occupied the attention of the town council during the last days of summer 1960. Earlier that

---

[1]Although it was not made an issue in this case, we would again repeat what we said in *Town of Little Compton* v. *Round Meadows, Inc.*, 108 R. I. 478, 276 A.2d 471 (1971). General Laws 1956 (1970 Reenactment) §45-24-6 authorizes the city or town solicitor to institute suit to enjoin a violation of a zoning ordinance. There is no statutory authority for injunctive relief from violations of a trailer-park ordinance. In the absence of some allegations of a nuisance or a threat to the public health, the town must resort to the penal sanctions contained in its ordinance. Here, the town amended its original complaint so that it was being brought by its "Zoning Inspector." The complaint had been originally initiated by the town solicitor.

year, the General Assembly had authorized the council to adopt an ordinance which would license the operation of mobile home parks and regulate the use of a mobile home[2] whether it was placed along with other mobile homes in a park or parked by itself elsewhere in the town. The first mobile home ordinance was enacted on September 9, 1960. One of the first licensees was Clarence Esty. In 1963, he sold his mobile home park to Pasquale J. Olivo. The council approved the transfer of the license from Esty to Olivo, who then formed the defendant corporation and transferred title of his newly acquired parcel to the corporation. Since 1964, any municipal licenses which have been issued concerning this commercial endeavor have been issued in the corporation's name.

In May, 1965, the council made several substantial changes in its mobile home ordinance. All mobile homes had to be located in a park. The maximum number of mobile homes that could be serviced at any given time in any park was 30. About five months later, in October, 1965, the town council reinforced its restrictive efforts relative to the immobilized mobile home by enacting a zoning ordinance in which the use of mobile homes was prohibited except that any mobile home park then in existence could continue and expand so long as its expansion did not exceed the 30-unit limitation found in the licensing ordinance. There were at that time three such parks in the town. Any potential mobile home park operator who might wish to locate in Glocester now found himself in the same zoning category as the manufacturer of fertilizer, the distiller of tar, or the owner of a commercial piggery.

---

[2]The enabling act and the ordinance speak of "mobile homes" and "trailers." We have referred throughout this opinion to mobile homes. What is said about a mobile home applies equally to a trailer. Both terms have been defined in the ordinance. The definitions are to be found in the appendix.

124

In reviewing the action taken by the Glocester Town Council in 1965, we would first observe that its mobile home licensing ordinance affects the utilization of property and not just the activities conducted thereon and hence qualifies as a quasi zoning regulation[3] within the meaning of *Town of Scituate* v. *O'Rourke,* 103 R. I. 499, 239 A.2d 176 (1968). Consequently, its constitutionality may be considered along with the zoning ordinance as part of a co-ordinated scheme to insure that no more than 90 dwellings in the mobile home classification are within the town at any time. We shall first direct our attention to the validity of the 30 mobile home limitation per park.

The common law permitted one to use his property in a manner and for such purposes as he chose so long as he did not maintain a nuisance or injure others. This right, however, has been made subject to regulations, restrictions and control by the state through the legitimate exercise of its police power. The test of legitimacy is the existence of a reasonable relationship between the exercise of this power and the public health, safety, morals and general welfare. A zoning limitation which is not so related represents a confiscation of private property without just compensation. *See Goldstein* v. *Zoning Board of Review,* 101 R. I. 728, 227 A.2d 195 (1967); *Buckminster* v. *Zoning Board of Review,* 69 R. I. 396, 33 A.2d 199 (1943); *Robinson* v. *Town Council,* 60 R. I. 422, 199 A. 308 (1938). When measured by these standards, the limitation of 30 mobile homes as applied to Olivo is patently unconstitutional. We have made this determination realizing full well that a duly enacted ordinance carries with it a presumption of constitutionality which will disappear only on a contrary showing beyond a reasonable doubt. *City of Providence*

---

[3]The licensing ordinance contains directives relative to site preparation for each unit, minimum lot size for each space, roads within the park, distances between each unit and the setback from the public highways.

v. *Stephens,* 47 R. I. 387, 133 A. 614 (1926). However, such a principle does not permit us to adopt an ostrich-like stance by burying our heads in the sand and ignoring the obvious.

The state plays a paramount role in the establishment of a mobile home park. General Laws 1956 (1968 Reenactment) ch. 21 of title 23 charges the Rhode Island Department of Health with the responsibility of licensing such a facility only after the department's director is convinced the proposed operation poses no threat to the public health. *See Hester* v. *Timothy,* 108 R. I. 376, 275 A.2d 637 (1971); *Town of Little Compton* v. *Round Meadows, Inc.,* 108 R. I. 478, 276 A.2d 471 (1971). A departmental field supervisor testified that in November, 1970, there were 56 mobile homes in Olivo's park. His prime concern was Olivo's failure to observe the municipal limitation of 30 units. In presenting this witness, the town conceded that it was not attempting to show the existence of any peril to the public health.

While elimination of congestion is commendable, the limitation of 30 is applied with a broad brush. It matters not what the individual acreage of any of the three parks in Glocester might be. If it is 3, 30 or 300 acres, the limitation remains the same. It is utterly beyond the bounds of reasonableness for the identical limit to be applied to three different parcels of land located in three different parts of the town.

The restrictive steps taken by the Glocester Town Council give us an opportunity to examine the motives of those who call their mobile house a home. We are told that "Recent population increases, coupled with the apparent inability of the United States housing industry to overcome problems of tight money, galloping costs, and labor shortages, have resulted in a serious undersupply of new single family dwellings in the low to middle price ranges.

These conditions have caused a rapid expansion of the mobile home industry. Derived from this is a demand for more mobile home parks, whose expansion has been frustrated by public pressure, municipal policies, and zoning restrictions which attempt to keep mobile homes and mobile home parks out of a given area." Van Iden, *Zoning Restrictions Applied to Mobile Homes*, 20 Clev. St. L. Rev. 196 (1970). It is believed that today one out of every five new single-family dwellings is a mobile home and that this fraction will increase. Note, *The Community and the Park Owner Versus the Mobile Home Park Resident: Reforming the Landlord-Tenant Relationship*, 52 B. U. L. Rev. 810 (1972). It is obvious that a mobile home park can no longer be primarily classified as a gathering place for a group of nomads who wander hither, thither and yon over the highways and byways. We cannot assume that an occupant of a mobile home poses any greater threat to the public safety than the other inhabitants of a municipality who might live in a more conventional type of residence. Many years ago, this court observed that a gasoline filling station was not a nuisance *per se*. *Sundlun* v. *Zoning Board of Review*, 50 R. I. 108, 145 A. 451 (1929). Today, the same sentiments can be expressed about a mobile home park.

The municipality's contention, that its limitation of 30 units constitutes an effort to lessen congestion, seems to be a diplomatic way of expressing its real concern, that of finding some way to maintain the population of its schools at a point where a stable tax rate can be preserved. We do not believe that a zoning ordinance was ever intended to fulfill such a function. Rhode Island, like its sister states, has witnessed the exodus from the cities to the suburbs. Our state is often described as the "City-State." A motorist may, because of our modern expanded system of highways, travel from one end of Rhode Island to its ex-

treme opposite end in the matter of just one hour. Glocester is a pleasant rural area. By automobile, it lies just about 25 minutes to the west of our capital city, Providence. Its 1965 zoning ordinance sets up four zones—agricultural, residential, commercial and industrial. The bulk of the town is zoned for agriculture. The commercial classification is subdivided into two categories—neighborhood commercial and highway commercial. Most commercial establishments are to be found along United States Route 44. Even though the council provided an industrial zoning classification, the zoning map, which is part of the ordinance, shows that no part of the town has been zoned industrial .

The 30-mobile home limit might be considered as one type of exclusionary zoning.[4] Its enactment brings to mind the following pertinent comment made by Mr. Justice Roberts speaking for the majority of the Pennsylvania Supreme Court in *National Land & Investment Co.* v. *Easttown*

---

[4]Strictly speaking, the council's actions did not amount to true exclusionary zoning because it permitted the three mobile home parks to continue to operate. An ordinance which in effect barred trailer or mobile home parks from an entire New Jersey municipality has been upheld. *Vickers* v. *Township Committee of Gloucester Township*, 37 N. J. 232, 181 A.2d 129 (1962). A contrary position has been taken in Michigan in *Gust* v. *Canton Township*, 342 Mich. 436, 70 N.W.2d 772 (1955). A compilation of diverse judicial views expressed on the validity of zoning regulations which exclude mobile home parks can be found in 42 A.L.R.3d 598. In *Steel Hill Development, Inc.* v. *Town of Sanbornton*, 469 F.2d 956 (C.A. 1st Cir. 1972), the constitutionality of a zoning amendment which changed the minimum lot size from three-fourths of an acre to three and in some instances to six acres was upheld. The court made it clear that its approval of the zoning enactment was limited to the facts as established by the record before it. In fact, Chief Judge Coffin expressed concern whether the amendment came about because the inhabitants of Sanbornton desired to keep "outsiders" beyond their borders. Population growth, he said, "* * * has to go somewhere, unwelcome as it may be, and in that case we do not think it should be channelled by the happenstance of what town gets its veto in first."

*Township Board of Adjustment,* 419 Pa. 504, 532, 215 A.2d 597, 612 (1965):

"The question posed is whether the township can stand in the way of the natural forces which send our growing population into hitherto undeveloped areas in search of a comfortable place to live. We have concluded not. A zoning ordinance whose primary purpose is to prevent the entrance of newcomers in order to avoid future burdens, economic and otherwise, upon the administration of public services and facilities cannot be held valid."

Later, in *Appeal of Girsh,* 437 Pa. 237, 243, 263 A.2d 395, 398 (1970), this distinguished jurist put Olivo's plight in its true perspective when he said:

"Zoning is a tool in the hands of governmental bodies which enables them to more effectively meet the demands of evolving and growing communities. It must not and can not be used by those officials as an instrument by which they may shirk their responsibilities."

Even though we have stated that the location and use of a mobile home is subject to a valid exercise of the police power,[5] the limitation of 30 mobile homes found in the Glocester zoning ordinance and its licensing counterpart, at least as it applies to Olivo's property, fails to satisfy the requisite constitutional standards.

Having invalidated the 30-unit restriction, we must next inquire as to Olivo's status. The town contends that since Olivo's was not issued its 1965 license, its operation cannot be designated as a *lawful* nonconforming use. We disagree.

Renewal time for Olivo's 1965 license was in December, 1964. On December 11, 1964, the council passed a resolution which stated, "Voted to grant the following trailer park licenses subject to the filing of an application * * *." Olivo's was one of the licenses mentioned in the resolution. At this particular point in time, the corporation's president

---

[5]*State* v. *Albro,* 102 R. I. 410, 231 A.2d 1 (1967).

and majority stockholder, Pasquale J. Olivo, was on active duty with the Navy. He was stationed in the Mediterranean area. He testified that he was unaware of what transpired but he assumed that his park manager had applied for a license. The town clerk could not recall if an application had been filed in behalf of Olivo for 1965. He did say, however, that his records showed no payment of the fee and "no license was granted."

In 1965, the licensing ordinance was amended. Among the many changes made in its provisions, apart from the 30-unit limitation, was an increase in the license fee from $25 to $100 plus the imposition of a $10 assessment on each unit "stationed, erected or maintained" in the park. Pasquale Olivo had returned from service and let it be known to the town officials that while he had no objection to the $100 fee, he would not pay the additional $10 per unit assessment, as it amounted to double taxation. Olivo's protest is apparently based upon a provision of the ordinance which requires the licensee to furnish the town clerk with the number of persons and the names of the owners of the units that have used his property during the preceding year. The town clerk is then to furnish the tax assessors with a copy of this information. In December, 1965, the council "renewed" Olivo's license. This time the authorities made renewal subject to the payment of the requisite fee. The $100 fee was paid but a license was not issued because of Olivo's failure to pay the additional assessment described in the ordinance.

In April, 1967, the town issued Olivo a license. It authorized the servicing of 30 units. Previously, in January, 1967, the Planning Board had authorized an expansion from 20

units to 30 units. Olivo paid $300[6] for the license. Pasquale Olivo testified that he was compelled to pay this sum, otherwise he could not have the use of mortgage money which had been made available to him. He also insisted that the $300 fee was a compromise payment of money due the town. No license was issued in 1968. Olivo paid the $100 but refused to pay the additional assessment. Finally, in July, 1969, the town council "revoked" Olivo's license. The corporation's chief executive also told the trial court that, during the years this controversy has occupied the attention of the town's officialdom, he had never been informed of the unlicensed status of the park.

It is abundantly clear that sometime between 1965 and July, 1969, Olivo expended a substantial amount of money in the development of the park. Although it has been said that the doctrine of estoppel may not be applied against a municipality, this rule is not without exception. Estoppel can be applied to a municipal as well as a private corporation when appropriate circumstances, justice, and right so require. 9 McQuillin, *Municipal Corporations* §27.56 at 755-56 (1964). Throughout a period of several years, the town continued to accept Olivo's $100 license-fee payment, the council continued to renew his license, and, in fact, the council voted to "revoke" a license which the town now claims was never issued. It is clear that Olivo's has incurred a severe financial liability as the result of the

---

[6] From the record, it is impossible to determine with certainty the legal basis for the fee charged Olivo's. The town clerk said he figured the fee by adding to the $100 licensing fee an additional $10 "for each trailer in the park." He then remarked that in April, 1967, Olivo's was licensed for 20 units. The ordinance, however, states that the $10 is to be assessed on every unit stationed in the park. It is not clear whether the council intended that the assessment is to be made upon each unit that might have rented space in a park during the preceding year or whether the assessment is made on the total number of units authorized by the council to be on the premises at any one given time.

issuance of the 1967 license even though the previous assessments had never been paid. In the light of the record before us, we believe that at this stage of the litigation the town should now be estopped from claiming that Olivo's nonconforming use was illegal. Our action, while based on the peculiar circumstances of this case, is not totally unprecedented. Recently, in *Rotella v. McGovern*, 109 R. I. 529, 288 A.2d 258 (1972), we said that the city of Providence, in a suit where damages were sought because of the backup of a sewerage sanitation main into a home, was estopped from raising the defense that the tie-in from the house to the main was illegal because no permit had been issued to the drainlayer who had connected the home's sewer pipe to the main drain.

Having determined that Olivo's has a protected nonconforming use, the next issue to be resolved is the extent of that use.

The answer to that question can be found, initially at least, with the Glocester Zoning Board. The zoning ordinance, art. VIII, sec. 5 provides for the enlargement, extension or expansion of a nonconforming use but fails to inform one whether relief is to be granted by way of an exception or a variance. We shall assume that since the council has included this provision within the ordinance, relief is to be granted by a grant of an exception. Because we are concerned here, however, with the potential confiscation of Olivo's property, this section is not apropos. The General Assembly, however, has provided against such an event by authorizing zoning boards to grant a variance pursuant to §45-24-19(c). In *Tuite v. Zoning Board of Review*, 95 R. I. 12, 182 A.2d 311 (1963), the zoning ordinance contained an absolute bar against the expansion of a nonconforming use. We ruled in *Tuite* that such a prohibition had to give way to the variance relief authorized in the statute.

Accordingly, after our remand, Olivo's shall file an application with the zoning board in which it can seek a variance. It will then be Olivo's burden to show the board that the zoning ordinance has made it economically prohibitive to continue the operation of its enterprise and that it is therefore being denied all beneficial use of its property. *See Bilodeau* v. *Zoning Board of Review*, 103 R. I. 149, 235 A.2d 665 (1967). At the hearing, Olivo's can show the extent of its operation at the time the zoning ordinance was adopted in 1965, the liability it has incurred in the development of the park up until the commencement of this suit, the income from its rentals, its operating expenses and such other factors as may be relevant to what should be the extent of Olivo's nonconforming use. It will then be the board's duty to weigh the evidence and then determine the number of mobile home spaces needed before the point of confiscation is reached. During the pendency of the proceedings to determine the extent of Olivo's nonconforming use, the order previously entered in the Superior Court preserving the status quo of the park during the instant appeal shall remain in full force and effect.

In conclusion, we would point out that our referral of the issue of the extent of Olivo's nonconforming use to the zoning board is in no way intended to foreclose the town and Olivo's from agreeing on a mutually acceptable number of units that will satisfy the constitutional mandate to which we have earlier alluded. This is a matter to be discussed and resolved, if at all, in the Superior Court.

The defendant's appeal is sustained. The judgment appealed from is vacated and the case is remanded to the Superior Court for entry of judgment in accordance with this opinion.

Mr. Justice Powers participated in the decision but retired before its publication.

## APPENDIX

"Mobilehome" shall be deemed to be any type of vehicle used for sleeping or living quarters, permanent or temporary, which may or may not be equipped with running water, bath facilities, flush toilet and/or other appropriate sanitary conditions, and which wheels are or could be attached thereto.

"Trailer" shall mean any house, car, or automobile trailer, other than a mobilehome, used for or adaptable for use as living quarters, permanent or temporary, and either with or without wheels attached thereto.

*Bradley L. Steere,* Town Solicitor, for plaintiff.

*Louis A. Geremia,* for defendant.