[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] CONSOLIDATED DECISIONS
The above captioned matters are companion cases before the Court on appeal from a single decision of the Zoning Board of Review for the Town of Charlestown. ("Zoning Board" or "Board"). Both cases have to do with the Board's reversal and remand, with instructions to approve, of a Charlestown Planning Commission ("Planning Commission" or "Commission") decision denying the Master Plan of a residential subdivision and major land development project proposed by defendant Beechwood Enterprises, Inc. ("Beechwood"). It is uncontested that Appellants Patricia Sprague ("Sprague") and Carolina Compact, LLC, ("Carolina Compact" or "Carolina") as abutting landowners, are parties aggrieved by the Board's decision.[1] Because both appeals contest the propriety of this single decision based solely upon statutory and ordinance provisions, this Court, in furtherance of judicial economy and to promote clarity, consolidated these cases upon motion by Order of November 18, 2002. This Order is a part of the record in both files.
 BACKGROUND
At the outset, this Court is compelled to observe the poor state of the record filed with this court. Section 45-23-67 of the Rhode Island Land Development and Subdivision Review Enabling Act of 1992, G.L. 1956 §45-23-25, et seq, ("Development Review Act") requires the planning board to transmit to the board of appeals "all papers, documents and plans, or a certified copy thereof, constituting the record of the action which is being appealed." Similarly, upon a subsequent appeal to this court, §45-23-71 requires the board of appeals to file "the original documents acted upon by it and constituting the record of the case appealed from, or certified copies . . ., together with any other facts that may be pertinent, with the clerk of the court. . . ." These records must be complete. In order for this court to assess the completeness of the record, it is elementary that any exhibits presented before the planning board or zoning board of review be marked and identified. Here, the record transmitted to the court, though containing a "Table of Contents," was disorganized and, in fact, the order of documents did not correspond to the order indicated in that "Table of Contents." Further, while two documents purport to be exhibits 4 and 5, as submitted to the planning board, no other documents are numbered as exhibits — leaving it to this Court to sift through and decipher the records and the role each played in the prior proceedings, as evidenced by the Planning CommissionMinutes. This Court observes that the failure to employ proper record keeping procedures may rise to such a level as to impair judicial review and, further, to evidence procedural deficiencies prejudicing one or more parties. When these concerns materialize the decision appealed from is subject to reversal or, at the very least, a remand for further proceedings is required. Nonetheless, the Court finds the record adequate to address the appeal.[2]
In May 1999 Beechwood Enterprises filed a pre-application for conceptual review by the Planning Commission pursuant to G.L. §45-23-35.[3] Beechwood proposed construction of a 25 lot residential subdivision for land located off of Route 112 in Charlestown, Rhode Island, designated as Assessor's Plat 28, Lot 82-1. Due to several, successive development moratoria enacted by the Planning Commission, concept plan review was not conducted until July 24, 2000.[4]
After meetings on July 24, August 16, and December 20, 2000, the Commission indicated its approval of a "cluster plan" development of 24 lots with a 100 foot perimeter buffer. (Record, Item 17, "Document T: Conceptual Approval" (Dec., 26, 2000)).[5] The Commission required that the Applicant submit "in writing the fire district recommendations on second or emergency access," as well as all submissions required by the "Master plan checklist" provision of the Ordinance. See Ordinance § 188-32.C. Further, the Board notified Beechwood that it would have to address certain concerns of the State Conservation Commission and provide an environmental impact analysis addressing all of the items included in the Ordinance, "unless obviously not applicable."[6]
A subsequent meeting was held before the Commission on June 20, 2001, at which Beechwood requested that the subsequent subdivision review stages, i.e., Master and Preliminary Plan Review, combined pursuant toOrdinance § 188-32.A. and G.L. § 45-23-39(c). (Minutes, Charlestown Planning Commission, "Carolina Farms — Major Subdivision" (Jun 20, 2001)). [hereinafter Minutes]. The Commission granted Beechwood's request. However, the Commission and Beechwood agreed that the application was incomplete.[7] Therefore, Beechwood and the Commission agreed that the remainder of the 60-day time period for certification of completeness, see G.L. §§ 45-23-40(b) and 41(b), would be tolled until Beechwood submitted all of the items required by the Planner in a list to be provided by him.
The Charlestown Town Planner, James Lamphere ("Planner"), certified Beechwood's application for combined Master and Preliminary Plan Review as complete on September 14, 2001. (Record, Item 17, "Certificate for Completion," (Sep. 14, 2001)). Included in the application were, interalia: a site analysis describing the sites environmental features (Record, Item 17, Doc. J); an environmental analysis discussing the predicted impacts of the project, including its impact on public services and traffic (Record, Item 17, Doc. U); a soil erosion and sediment control plan (Record, Item 17, Doc. R); and a comprehensive packet of stormwater drainage calculations (Record, Item 17, Doc. Q).
Also included in the application packet was a letter from the Rhode Island Historical Preservation Heritage Commission. The letter is self-identified as an "advisory opinion . . . regarding the archaeological sensitivity of the project area." (Record, Item 17, Doc. P, Letter from Edward Sanderson, Executive Director, Deputy Statehistoric Preservation Officer to Evelyn Smith, Beechwood Enterprises,Inc. (Feb. 20, 2001)). The letter indicated that the site "may contain significant archaeological remains" dating from the post-1709 use of the site as part of a Narragansett Indian Reservation. Id. The Commission advised that "a Phase I(c) archaeological survey be conducted to determine the presence of such sites. . . ." Id. Beechwood had provided no archaeological survey when the Planner certified the application complete for purposes of the combined Master/Preliminary Plan Review (or anytime thereafter).
An initial, non-public meeting was held regarding the application on September 19, 2001. At that time, the Planner indicated concerns regarding the size and location of a proposed emergency access easement, which Beechwood proposed in lieu of a second principal means of ingress and egress. Also at that time, the Commission agreed that the Applicant could pay a fee rather than dedicating land for recreational use by future subdivision residents.[8] However, the Commission did not waive the requirement of a 100 foot, open space perimeter buffer; as to this the Commission suggested that an easement — in addition to the proposed emergency access road — be created through Lots 18 and 19 to provide residents with an access to the open space, in addition to that provided by the emergency access easement.
Finally, and importantly, the Commission "discussed whether or not it is fair to require this applicant to have underground utilities, when other recent subdividers have not been required to have underground utilities, and came to the conclusion that they will not be required to have underground utilities at this point." (Minutes, p. 4 (Sep. 19, 2001)).[9]
At a hearing on October 17, 2001, Applicant presented evidence in favor of its application. Issues discussed at the hearing included environmental issues, such as whether a vernal pool existed on the property[10] and proposed re-vegetation of the property after construction; abutters' concerns that underground utilities should be required; and the conformity of the subdivision with the Town's subdivision and zoning area requirements.
Most pertinent to this appeal, Applicant presented the testimony of Christopher Mason, an expert in planning and wetlands who had prepared Applicant's "Environmental Analysis." Among other things, Mr. Mason testified to the project's proposed "Amber Way" access to Route 112. Mr. Mason testified that applicant's design was consistent with the Comprehensive Plan and good planning practices. He testified that, given prevailing traffic conditions, the sight distance for vehicles traveling on Route 112 and approaching Amber Way was suitable. He testified that "[p]eople tend to travel faster than the posted speed limit, but . . . there is a good site [sic] distance from either direction." (Minutes, p. 4 (Oct. 17, 2001)). He further testified that the additional traffic from the subdivision would not affect the flow of traffic on Route 112. (Applicant also presented a letter from the Town's fire chief finding a single principal access with an emergency access road to be adequate. (Minutes, p. 4 (Oct. 17, 2001)).[11]
Mr. Mason was cross-examined on October 29, 2001, by Attorney Paul Singer, representing The Carolina Compact. Mr. Singer cross-examined Mr. Mason on most aspects of the "Environmental Analysis." As to traffic conditions, Mr. Singer questioned whether Mr. Mason was aware of the Town's rush hours, periods when traffic flow would be particularly heavy. Mr. Singer questioned whether Mr. Mason's prediction of 192 trips per day entering and leaving the subdivision "would not improve that rush hour." Mr. Mason replied that it would not "improve" it. (Minutes, p. 7-8 (Oct. 29, 2001)).
Mr. Singer also used the opportunity to highlight the proposed subdivision's cost to the Town, questioning Mr. Mason as to the content of the "Cost/Benefit Analysis" section of his "Environmental Analysis." (See Record, Item 17, Doc. U).[12] Thus, Singer pointed out that Mr. Mason predicted that the annual school expenditures by the Town would total $152,418, and non-school expenditures would total $52,640; whereas tax revenues from the subdivision would amount only to $87,448. Singer observed that over a fifty year period the cost to the Town would exceed $5 million. (Minutes p. 8 (Oct. 29, 2001)).
At the next hearing, on November 29, 2001, Mr. Singer presented the testimony of Town Police Chief Thomas Sharkey. The Chief testified that when traveling southbound on Route 112 the sight distance to the proposed Amber Way was less than 300 feet. (Minutes, p. 1 (Nov. 29, 2001)). His conclusion was based on the presence of a "crown in the road," which he alleged obfuscated the sight distance. Id. at 1-2. Chief Sharkey testified that recent Department of Transportation surveys showed that, despite a posted speed limit of 35 mph, 85% of vehicles on Rt. 112 traveled between 42 and 47 mph, and the other 15% travel in excess of that. Id. The Chief testified that, based upon his familiarity with traffic and highway safety, for a vehicle moving "at 300 feet traveling at 40mph there would not be enough time to stop." Id. at 2. However, Applicant presented the testimony of Mr. Donald Jackson, who designed the Amber Way entrance. Mr. Jackson testified that the plan was designed for a 40 m.p.h. sight distance, "braking on wet pavement," and that there was adequate sight distance for this speed. Id. Chief Sharkey himself had previously inspected the entrance/exit site and found that it was adequate for the neighborhood and, as he reported in a letter to the Planner, had no objections to its location." (See Record, Item 17, Doc K-4, Letterfrom Tom Sharkey to James Lamphere, received Sept. 14, 2001)). When questioned by Applicant, the Chief responded that his new testimony was based upon the fact that actual speeds on Route 112 were higher than posted speed. (See Minutes at 2 (Nov. 29, 2001)).
Bruce Goodsell, the Assistant Town Solicitor, advised the Commission that it was inappropriate to consider vehicles that violated the law by traveling in excess of the posted speed. Id. at 3.
Also at the November 29, 2001 hearing, a representative of the Narragansett Indian Historic Preservation Office expressed concern over the need for an archaeological survey, as recommended by the state Historic Preservation Commission. After some discussion, one of the Commissioners motioned to follow the HPC's recommendation and to require a survey. Id. at 3. Another of the Commissioners expressed her confusion that she thought the Commission had already required a survey, as part of the "Environmental Analysis," when it granted Concept approval on December 20, 2000. After some discussion the motion was withdrawn on the understanding that the Commission could approve the plan subject to a subsequent archaeological survey. (See Minutes at 4 (Nov. 29, 2001)).
At the November 29 hearing the issue also came up that Applicant's pending Physical Alteration Permit ("PAP") — for construction of the Amber Way entrance and subdivision streets — was submitted to the R.I. Department of Transportation ("DOT") with erroneous information. This was confirmed at the next hearing on December 12, 2001. Applicant's initial PAP application showed a posted speed of 30 m.p.h. on Route 112, but the actual posted speed was 35 mph. Applicant stated that a corrected PAP application was already submitted to the DOT. (Minutes, p. 1 (Dec. 12, 2001)).
Other issues discussed at the December 12, 2001 hearing included lot design, land slope contours,[13] the possibility of an archaeological survey as a condition of approval, Applicant's soil erosion control plan, and, again, whether underground utilities would be appropriate.
The next meeting was held on January 3, 2002. At that meeting, the Commissioners discussed that Applicant would be using portions of the subdivision's perimeter buffer for stump dumps, a drainage easement, and as part of the emergency access easement. The Commissioners expressed concern that these structures would defeat the purpose of the buffer as an audio-visual screen.
 The Planning Board Decision
On January 10, 2002 the Planning Commission moved to approve the project application with various conditions of approval proposed by the applicant. These included that the Applicant provide permanent bounder markers along the boundary of the parcel, that the Amber Way entrance be landscaped in accordance with subdivision regulations, that proposed curb cuts be shown on the final plan, and that the Applicant be required to plant trees should the Commission deem natural vegetation to be insufficient. The list also required the applicant to secure a Physical Alteration Permit from the R.I. DOT, and conduct a Phase I(c) archaeological survey. The Town Planner recommended that the combined plan be approved with these "conditions of approval." Thereafter, the Commission voted to include a condition of underground utilities, an issue which was raised during the hearings by concerned abutters, but which, again, the Commission had stated would not be required." (Minutes, p. 4 (Sep. 19, 2001).
The vote to approve failed 3-2, even with the condition of underground utilities. See G.L. § 45-23-63(d).[14] The Commission's decision was addressed to Ms. Evelyn Smith of Beechwood Enterprises, Inc., and written by the Planning Commission Clerk. (Appellee Beechwood Enterprises, Inc.'s, Memorandum of Law, W.C. Nos. 02-0254, 02-0255 Exhibit 1 (Apr. 2, 2003)). The letter is not a part of the certified record and does not include findings of fact. Rather, the only basis set forth for the decision was the concerns expressed by Commissioner Platner during the January 10, 2002 meeting. It is noteworthy that the letter is a mere recital of the minutes of the meeting.
Commissioner Platner premised her vote of denial on the absence of a physical alteration permit for the State Department of Transportation, and the lack of Phase I(c) archaeological survey. She also cited the Town Police Chief's concern that the location of the proposed Amber Way was a public safety issue, and an abutter's concern that the location of the emergency access road was "very close to the abutter." However, Platner concluded that "she does not think the plan would be denied if it were complete."
The bases of the remaining Commissioner members, recounted in theMinutes of January 10, 2002, were much more vague. Commissioner Arnold denied because, he concluded, the
 traffic issue is unsafe, the buffer as a stump dump is improper, the question of who will maintain Lunar Way,[15] the [Narragansett Indian] Tribe should also have the opportunity to survey the entire parcel before any disturbance, and the uncertainty of the school system in the next few years.
Commissioner Mello voted to deny because there were "too many unanswered questions, too many conditions of approval." He referred specifically to missing the Physical Alteration Permit and the lack of an archaeological survey. Id. Further, he felt that "the proposed subdivision does not adhere to good planning practices and that it violates the Comprehensive Plan and Subdivision Regulations, and must err on the side on [sic] conservation." Id. However, neither Mr. Arnold nor Mr. Mello offered any factual findings in support of their conclusions.
 The Board of Appeals Decision
Beechwood timely appealed the decision to the Charlestown Zoning Board, sitting as the platting board of appeals. Beechwood claimed prejudice on resulting from the improper inclusion of a condition requiring underground utilities.[16] Beechwood also claimed that the Planning Commissioner's bases for denial were in clear error of law, lacked support by the weight of the evidence of the record, and resulted in prejudicial procedural error to Beechwood.
After hearings on March 12, 2002 and April 9, 2002, the Board met for decision on April 15, 2002. The Board's decision is memorialized in a letter of April 19, 2002, addressed to Mr. and Mrs. Smith of Beechwood Enterprises, Inc., and written by the Zoning Board of Review Appeals' Clerk. (See Record, Item #21).
The Board addressed the various reasons provided for the Commissioners' decision, unanimously voted to overturn, and remanded the application to the Planning Commission "for approval with all conditions agreed upon, with the exception of underground utilities." Id. at 5.
Now before the Court is the appeal of Patricia Sprague and Carolina Compact, Inc. Appellants allege that Applicant's failure to provide an archaeological survey or proper Physical Alteration Permit were valid grounds for denial. Further, Appellants contend that the zoning board of appeals substituted its opinion for that of the Planning Board, because the latter had sufficient evidence to find that the proposed Amber intersection created a safety hazard, to find that the subdivision would have an adverse impact upon the Town's school system, and to find that the perimeter buffer would not function as a true visual buffer. Alternatively, Appellants contend, the Board abused its discretion by remanding for final decision rather than for further consideration.
 STANDARD OF REVIEW
The standard of review for this Court's reviews of zoning board decisions, where that board is acting as the appellate authority on planning board decisions, is articulated in R.I. Gen. Laws 1956 §45-23-71(c), which states:
 (c) The court shall not substitute its judgment for that of the planning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
 (1) In violation of constitutional, statutory, ordinance or planning board regulations provisions [sic];
 (2) In excess of the authority granted to the planning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of [sic] law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Thus, this Court does not conduct a de novo review, but "is limited to a search of the record to determine if there is any competent evidence upon which the agency's decision rests. . . ." Restivo v. Lynch, 707 A.2d 663, 665 (R.I. 1998) (quoting E. Grossman Sons, Inc. v. Rocha,118 R.I. 276, 285-86, 373 A.2d 496, 501 (1977)).
Rhode Island General Laws 1956 § 45-23-70 provides that standard of review that the zoning board ("zoning board" or "Board"), when sitting as the board of review for planning commission decisions[17] ("planning commission" or "planning"), must adhere to. Section 45-23-70(a) provides, in part, that:
 the board of appeal shall not substitute its own judgment for that of the planning board or the administrative officer but must consider the issue upon the findings and record of the planning board or administrative officer. The board of appeal shall not reverse a decision of the planning board or administrative officer except on a finding of prejudicial procedural error, clear error, or lack of support by the weight of the evidence in the record.
Thus, under the Development Review Act of 1992 the zoning board of appeal no longer functions as a "`super' planning board" entitled to entirely disregard the planning board's findings, as it once could. SeeE. Grossman, 118 R.I. at 282, 373 A.2d at 500.[18] The Board may reverse a decision only if the planning board has made an error of law, if there was a procedural defect that resulted in prejudice to the appellant. Further, though the Board must not substitute its own judgment as to the findings made by the planning commission as to conflicting, competent evidence,[19] where those findings nonetheless do not support the planning commission's decision or are in "clear error," the zoning board may properly reverse the commission's decision.
In instances, where the Commission's findings do not support the decision or are in clear error, Section 45-23-70(c) directs that:
 [i]n the instance where the board of appeal overturns a decision of the planning board or administrative officer, the proposed project application is remanded to the planning board or administrative officer, at the stage of processing from which the appeal was taken, for further proceedings before the planning board or administrative officer and/or for the final disposition, which shall be consistent with the board of appeal's decision.
Further, G.L. § 45-23-60(a) requires that the approving authority make positive findings to the effect that:
 (1) The proposed development is consistent with the comprehensive community plan and/or has satisfactorily addressed the issues where there may be inconsistencies;
 (2) The proposed development is in compliance with the standards and provisions of the municipality's zoning ordinance;
 (3) There will be no significant negative environmental impacts from the proposed development as shown on the final plan, with all required conditions for approval;
 (4) The subdivision, as proposed, will not result in the creation of individual lots with any physical constraints to development that building on those lots according to pertinent regulations and building standards would be impracticable. . . . Lots with physical constraints to development may be created only if identified as permanent open space or permanently reserved for a public purpose on the approved, recorded plans; and
 (5) All proposed land developments and subdivision lots have adequate and permanent physical access to a public street. Lot frontage on a public street without physical access shall not be considered in compliance with this requirement.
Where the planning commission denies an application without making express findings of fact in its written decision, on a particular issue, the Board may remand for "final disposition" where that issue was not a basis of the Commission's denial. See Craig v. J.F. Smith Builders,Inc., 2002 R.I. Super Lexis 178 (Gagnon, J.).[20]
 ANALYSIS
I. Archaeological Survey
Among the Commissioners' bases for denial was the absence of an archaeological survey. The zoning board of appeals concluded that to deny subdivision approval because of this was prejudicial procedure error. Appellants disagree. For the following reasons, this Court finds that the zoning board of appeals decision was supported by the substantial, reliable, and probative evidence of the record, was neither arbitrary nor capricious, and was in accord with existing law.
The Ordinance mandates that the Commission require an "applicant to submit an environmental analysis of the proposed development" if one of several conditions are found to be met. § 188-19(A). One of these is that the Commission "finds a reasonable cause that the proposed development will have a negative impact on the natural or man-made environment on the property or upon nearby properties. . . ." § 188-19.A.(11). The Commission generally must inform an applicant that an analysis will be required at the conceptual stage, though "[the] Commission reserves the right to require an environmental analysis at later stages if it finds environmental resources that may be threatened by the proposed development." § 188-19.(11).
Here, the Board required, as part of its conceptual approval on December 20, 2000, that the applicant submit an environmental impact analysis addressing all of the items included in the Ordinance. One of the items is the potential impact of the site upon "historic/archaeologic sites." § 199-19.B.(2)(c). However, the Minutes indicate that the applicant was not required to address items that were "obviously not applicable." Importantly, the analysis was required at the December 20, 2000 hearings, two months before the state Historic Preservation Commission recommended an archaeological survey.
Even after receiving the HPC letter, the Planner certified the application as complete, on September 19, 2001, though no archaeological survey was submitted. Moreover, the Minutes reveal that the Commission expressed a noncommittal attitude toward the pre-requirement of a survey throughout the hearings. On November 29, 2001, one of the Commissioners requested that a survey be required; however, the motion was withdrawn on the understanding that a survey could be made a condition of any approval given. And, as late as December 12, 2001, the Commission's Chair stated the Commission intended to require the survey as a "condition of approval." Minutes (Dec. 12, 2001). Thus, despite the Commission's requirement of a full environmental analysis, this Court cannot conclude that this Applicant was derelict in not providing an archaeological survey as part of the environmental analysis where the record shows that the Commission did not initially contemplate an archaeological survey and the Planner certified the application as complete without further notification of the delinquency.
Importantly, while a Planner's certification does not generally preclude the Commission from requiring additional information "specified in the regulations but not required by the administrative officer," G.L. § 45-23-36(c), here the Commission prejudiced the applicant by combining both master and preliminary review without first assuring that all necessary materials were submitted. The planning commission may combine review stages only after "the planning board determines that all necessary requirements have been met by applicant." G.L. § 45-23-39(c). (Emphasis added).[21]
On June 20, 2001, the Commission signified that master/preliminary plan review could be combined subject to applicant's supplying the additional information specified in a list to be prepared by the Planner. When the Commission later discovered that it improperly determined that all necessary requirements were met — or, here, improperly vested the Planner with that determination — the proper result was to issue a conditional approval or to extend the time for action upon conferral with the applicant, as authorized by G.L. § 45-23-41(f). See also G.L § 45-23-36(d). This would ameliorate the prejudice caused to applicant by the Commission's premature consolidation of master and preliminary review. Instead, three of the Commission members voted to deny the application because no archaeological survey was submitted and the 120 day period to act on the combined plan was running out.
This Court finds that, under the facts of this case, the record substantiates the zoning board's determination that the planning Commission committed prejudicial procedural error when it denied the approval of Applicant's combined Master/Preliminary plan because of the absence of an archaeological survey.
II. Physical Alteration Permit
Two of the three Commissioners who voted to deny cited the absence of a final Physical Alteration Permit as a basis for their decision. Beechwood argues that the zoning board of appeals properly determined that this was an invalid basis because the Planning Board had the authority and duty to extend the 120 day decision period to afford Beechwood to secure the application or, alternatively, to approve the proposed subdivision with a condition of PAP approval. Appellants argue that a PAP is a prerequisite to approval and that the Commission has discretion, but not the obligation, to extend the time for approval if the applicant agrees.
R.I.G.L. § 45-23-41(f) provides that the Commission shall, approve with conditions, or deny an application for preliminary review within 120 days from the date it is certified as complete, "or within such further amount of time that may be consented to by the developer." § 45-23-41(a)(2) states that, for preliminary review, an applicant shall submit "all permits required by state or federal agencies prior to commencement of construction, including permits related to . . . connections to state roads." Further, Ordinance § 188-33(B)(7)(e)(9) specifically requires a physical alteration permit for preliminary review. Here, Beechwood submitted an application without the necessary DOT approval. Despite this, the Planner certified the application as complete for combined Master/Preliminary Plan Review, thereby beginning the 120 day period.
In the instant case, the incorrect, initial PAP application was flawed because of Beechwood's error. Despite the absence of a required PAP, the Planner certified the application as complete. Nevertheless, the Commission is authorized to require "correction of any information found to be in error and submission of additional information specified in the regulations . . ., as is necessary to make an informed decision." G.L. §45-23-36(c). When the Commission does so, it may postpone review with the consent of the applicant. G.L. § 45-23-36(d). In such cases, the period for review is stayed and resumes where the Planner or the planning board determines that the required information is complete. Id.
Here, the Minutes clearly show that Beechwood requested and consented to an extension of time in order for Beechwood to reconsider its denial and so that Beechwood could "come back to answer any additional concerns [the Commissioners] have." (Minutes p. 7-8 (Jan. 10, 2002). The purpose of our statutes mandating planning commission action on subdivision proposals within a specified time "is to remedy indecision, protracted deliberations, and deliberate or negligent inaction on the part of the approving authorities." 5 Rathkopf, The Law of Zoning and Planning, § 91:7 (2002). Thus, the 120 day provision is for the protection of applicants for subdivision relief. Because the time limitations imposed upon Commission action are intended for the benefit of the applicant, Beechwood ought to have been granted an extension of time when it was discovered that an unintentional error had been made and that further submissions were required. G.L. § 45-23-36. However, the Planning Commission refused to grant additional time. The zoning board of appeals properly concluded that this was prejudicial procedural error.
This Court finds that the Zoning Board of Appeals conclusion is supported by the substantial, reliable, and probative evidence of the record, is neither arbitrary nor capricious, and was not affected by error of law. G.L. § 45-23-71.
III) Impact Upon The Public School System
Only Commissioner Arnold cited "the uncertainty of the school system in the next few years" as a basis for denial. The Commissioner, however, provided no explanation of or findings to support this statement. Further, the only evidence on the record relating to school systems is found in Mr. Mason's "Environmental Analysis." (Record, Item 17, Doc. U, §§ 2.5, 2.5.1). Mr. Mason concluded, that, using estimated populations provided by the R.I. Department of Administration's Statewide Planning Program, the proposed subdivision would be expected to house 19 school children. Mr. Mason concluded that while the local schools were "close to capacity," Charlestown had already enacted ordinances designed to increase the schools' capacities. Thus, Mr. Mason, concluded, "[w]ith the implementation of [these] capacity improvements by Chariho (or the Town of Charlestown), additional school-aged children from the proposed development should not pose a significant burden to the school system."Id.
Some courts have held that a Planning Commission may deny subdivision approval where existing public improvements are so inadequate as to not be reasonably able to absorb the predicted growth — as where a school system is at or above capacity — and where the tax benefits to be received by the subdivision are insufficient to remedy the deficiency. See 2 Rathkopf, The Law of Zoning and Planning, § 15:30 (2002). However, a municipality should not prevent the entrance of newcomers solely to avoid future burdens, economic or otherwise, upon the administration of public services and facilities. Cf. Town of Glocester v. Olivo's Mobile HomeCourt, Inc., 111 R.I. 120, 300 A.2d 465 (1973) (zoning ordinance with this purpose is invalid). Because the only evidence submitted as to the subdivision's impact on the school system was provided by Mr. Mason and concluded that the Town's school capacity could satisfactorily absorb the increase caused by Beechwood's proposed subdivision, the Commissioner's basis was in clear error. And, though the Commissioner may have based his conclusion, that the school system was so precariously situated that Mr. Mason's conclusion was unreliable, on his own knowledge or observations, he failed to disclose any facts, upon which he might have relied, on the record. Therefore, such facts, if any, cannot sustain the decision. SeeToohey v. Kilday, 415 A.2d 732, 737-38 (R.I. 1980).
Thus, this Court finds that the zoning board properly determined, based upon the substantial, reliable and probative evidence of the record, that this was an improper ground for denial, based upon clear error, and resulting in prejudice to Beechwood.
IV. Impact Upon Traffic
Again, only Commissioner Arnold cited the proposed subdivision's impact upon traffic on Route 112 as a basis for denying Beechwood's application, stating that the "traffic issue is unsafe. . . ." (Minutes (Jan. 10, 2002)).[22]
Although there was evidence indicating that the entrance to Amber Way could be dangerous, the evidence was not of a nature to support the Commissioner's conclusion. The Town Police Chief testified only that there was inadequate sight distance to provide drivers with a safe stopping distance if those drivers were exceeding the posted speed limit, in violation of the law. (Minutes, (Nov. 29, 2001)). Applicant presented the testimony of Mr. Donald Jackson, who designed the Amber Way entrance. Mr. Jackson testified that the plan was designed for a 40 m.p.h. sight distance, "braking on wet pavement," and that there was adequate sight distance for this speed. Id. Chief Sharkey had inspected the entrance/exit site, found that it was adequate for the neighborhood and, as he reported in a letter to the Planner, had no objections to its location." (See Record, Item 17, Doc K-4, Letter from Tom Sharkey toJames Lamphere, received Sept. 14, 2001)). When questioned by Applicant, the Chief responded that his changed opinion was due to his receipt of information that actual speeds on Route 112 were higher than posted speed. (See Minutes at 2 (Nov. 29, 2001)).[23]
The zoning board of appeals addressed the traffic issue. The board determined that it was unfair to restrict Applicant's right to subdivide because of travelers' violations of speed restrictions. Appellants argue that a town may consider prevailing traffic conditions, regardless of their legal status. Appellants argue that, otherwise, the Town would be saddled with the cost of enforcing the speeding restrictions, though they might otherwise not. Further, Applicants contend that the speeding is not a traffic hazard in and of itself, but that approval of the subdivision will be the cause of a hazard. Therefore, they contend, the negative impact is caused by the subdivision, and not by the pre-existing traffic.
Appellants' arguments are incorrect. A planning commission may consider existing traffic conditions and may properly restrict development where the development will cause an increase in traffic congestion. See 83 Am.Jur. 2d Zoning and Planning § 58 (2002); 5 Rathkopf, The Law of Zoningand Planning, § 90:11 (2002). Furthermore, a commission may require adherence to prescribed sight distances for proposed intersections. 2 Rathkopf, The Law of Zoning and Planning, § 15:30, 1 (2002). "For such evidence to be effective upon the ultimate determination, however, it should relate, not to the existence of congestion at the location of the proposed use, but to whether the traffic generated by its establishment at that site will intensify the congestion or create a hazard." BonitatiBros. v. Zoning Bd. of Review, 104 R.I. 170, 242 A.2d 692 (1968) (citingThomson Methodist Church v. Zoning Board of Review, 99 R.I. 675,210 A.2d 138 (1965); Center Realty Corp. v. Zoning Board of Review,96 R.I. 482, 194 A.2d 671 (1963)). (Emphasis added). Here, the alleged safety hazard, i.e., inadequate sight distance, does not inhere in the placement of the Amber Way intersection. Rather, it is only when, subsequently, travelers approach the intersection at an illegal speed that safety becomes an issue.
To allow an unidentified, third party's prospective violation of the law to work a restriction upon an otherwise conforming subdivision would open the door to flagrant abuses and egregious injustices. It is conceivable, for example, that a hostile abutter, anticipating an unwanted subdivision, could undertake an illegal action on his or her own property that, in conjunction with the proposed use, would create a hazard to the community. Were Appellants' arguments correct, a municipality would be free to ignore the violation in favor of restricting lawful development. This is clearly an impermissible result.
Thus, this Court finds that the zoning board of appeals decision was not affected by error of law, or clearly erroneous in view of the substantial and reliable evidence of the record.
V. Perimeter Buffer
Commissioner Arnold also cited the use of a stump dump in the open space, perimeter buffer as grounds for denial. It was his conclusion that such use "is improper."[24]
The Charlestown Zoning Ordinance requires a vegetated perimeter buffer for all residential cluster subdivision. Zoning Ordinance § 218-60.F. A buffer is simply "land that is maintained in either a natural or landscaped start, and is used to screen and/or mitigate the visual impacts of development on surrounding areas, properties or rights-of-way." Id. § 218-5.B. (defining, inter alia, "Buffer"). A buffer must be "at least one hundred feet wide around the entire perimeter of all lots to provide a visual and audio screen between adjacent land uses." Id. While generally no structures may be built in the buffer, the Commission may permit stormwater control and drainage structures in the buffer zone. Id. § 218-60.F. Finally, the 100 foot requirement can be reduced if (1) adjacent land already serves as open space and the Applicant demonstrates that "it is likely to remain so," (2) the Commission finds that there is an existing substantial, permanent natural barrier that will serve as a buffer, or, (3) interior lands are so environmentally sensitive as to advise perimeter development. Id.
The Commissioner made no findings and provided no legal basis for his conclusion that use of a perimeter buffer as a stump dump is "improper." Presumably, he was relying on Zoning Ordinance § 218-60.H.(2), which states that,
 "[l]and that has been environmentally damaged shall not be accepted for a cluster subdivision until such land is restored to a condition that the Commission determines to be satisfactory to effect the purposes of this section."
The Zoning Board members failed to address this ground for denial, perhaps because only one Commissioner asserted the presence of the stump dump. Nevertheless, this Court is compelled to observe that the Minutes
indicate that these "dumps" will be buried and subsequently re-landscaped. (See Minutes (Jan 3, 2002)). Commissioner Arnold made no findings to the contrary, but merely concluded that use of a portion of the buffer as a stump dump is improper.
Upon remand, should the Commission wish to revisit this issue and rely upon this as a basis of denial, it must make findings of fact, based upon evidence in the record, to the effect these stump dumps will not be landscaped and, for that reason, do not conform to the Zoning Ordinance's requirement of a visual screen. However, if the dumps are intended to be buried and maintained in a vegetative state, the Zoning Ordinance
provides minimal discretion to the Commission. Only if the stump dump is so visually obtrusive as to constitute a permanent and recognizable disfigurement upon the landscape should the Commission deem it unsatisfactory, pursuant to Zoning Ordinance § 218-60.H.(2).
As to the drainage easements located within the buffer, these are permissible pursuant § 218-60.F. However, the Commission may similarly determine that any structures included as part of these easements vitiate the intended purposes of the perimeter buffer.
 Conclusion
For the foregoing reasons, this Court concludes that the decision of the zoning board of appeals was not affected by error of law, was not made upon unlawful procedure, and was supported by the reliable, probative, substantial evidence of the record. However, the Board failed to address the Commissioners' concern with Beechwood's proposed use of the perimeter buffer. Because the Planning Commission failed to provide any findings of fact in support of its conclusion that use of the perimeter buffer for stump dumps is improper, the zoning board is without means to assess the basis for denial. See Veronneau v. CumberlandPlanning Bd. of Appeals, 2003 R.I. Super. Lexis 132 (Darigan, J., 2003). Thus, upon review of the record, the Court remands this matter to the Board of Appeals for a written decision that reviews the written decision of the Planning, after remand to the Planning for findings of fact as tothe buffer issue, or for reconsideration of the issue and approval in accordance with the terms of decision of the Zoning Board of Appeals.
[1] This Court, where appropriate, will refer to both parties merely as Appellant or Appellants.
[2] One of Appellant Carolina Compact's contentions on appeal is that the zoning board of appeals was required to obtain transcripts of the Planning Commission proceedings. These transcripts were made by Beechwood for its own use and at its own expense. See Tr. at 15 (Mar. 12, 2002) (Consolidated Appeal, Beechwood Enterprises, Inc v. Town Planner of theTown of Charlestown, Beechwood Enterprises, Inc v. Planning Commission ofthe Town of Charlestown). It is Carolina Compact's position that the transcripts are the actual record, and that, therefore, the zoning board was required to review these, pursuant to G.L. § 45-23-70.
Appellant's argument is incorrect. Here, the Minutes prepared by the Planning Commission were the official record. While this Court is of the opinion that independently prepared transcripts may be offered to the board of appeals — despite the general prohibition against introduction of new evidence at that stage — there is no evidence in the board of appeals' transcript that any of the appellants offered the Commission transcript as an exhibit. See Griggs v. Estate of Griggs, 2004 R.I. LEXIS 74, 14-15 (Vogel, J. 2004) ("A judge must be clear when privately commissioned transcripts are to be made a part of the record. The best way to ensure that the transcripts are officially included is for the 
judge to mark the transcripts as an exhibit").
Given the Appellant's understandable confusion as to whether an independent transcript might be inadmissible, and given the history of this case, upon remand the zoning board of appeals or planning commission should consider all transcripts then offered as exhibits.
[3] Concept review is an informal process whereby an applicant may seek advice as to applicable laws and ordinances and as to the required steps for approval of a proposed development project. G.L. § 45-23-35(a). Concept review also provides the planning board with an opportunity for input into the "formative stages of major subdivision and land development concept design." G.L. § 45-23-35(b). However, concept review and other pre-application "discussions are not considered approval of a project or its elements." G.L § 45-23-35(d). Charlestown's own "Subdivision and Land Development" ordinance, § 188-26.A.(2), requires "the submission of several conceptual layouts" so that the Planning Commission can provide "its initial opinion" as to which one is best suited for the site, taking into account various topographical site conditions, environmental impact, street layout, and problems associated with previous, similar uses. See CODE OF THE TOWN OF CHARLESTOWN, RHODE ISLAND, Ch. 188, "Subdivision and Land Development" (2000). ["Ordinance"]. Thereafter, the Ordinance requires a public informational meeting for, inter alia, all major land development projects. Id. at § 188-26.A.(3)(a). See also G.L. § 45-23-39(b). The Ordinance specifies additional submission requirements for this meeting. See id. at § 188-26.B.
[4] Beechwood refers to these moratoria as "having thwarted the Applicant's efforts to be heard," (Beechwood Memo. at 3, "Fact Travel of the `Carolina Farms' Application," para. 5 (Apr. 2, 2003)), "notwithstanding the fact that the application had been filed prior to the implementation of the emergency moratorium." (Id. para. 3). However, despite this protest, there is no suggestion in the record or the memoranda that Beechwood attempted to avail itself of its right, pursuant to G.L. § 45-23-35(e), to file an application for master or preliminary review after 60 days from its pre-application submission.
[5] For purposes of this opinion, Items are as numbered in the Table of Contents to the record presented to this Court. Most documents included in Item #17, "Charlestown Subdivision/Land Development Application Packet," are identified by letter; presumably, the documents were lettered by Beechwood prior to submitting its application. The letters can be found in the top left-hand corner of the documents. For documents so lettered, for all citations subsequent to the first, this Decision will use only the Item number and document letter. For those documents not numbered, the Court will use the Item number and the identifying title.
[6] One of the items listed in the Ordinance is the potential impact of the project upon "historic/archaeologic sites." § 199-19.B.(2)(c).
[7] A planning commission or board may combine review stages only after "the planning board determines that all necessary requirements have been met by applicant." G.L. 45-23-39(c); Ordinance, § 188-32.A.
[8] Either a dedication of such land or payment of a fee, or both, is required by Ordinance §§ 188-23.A., 188-23.F.
[9] Given the importance placed on the issue of underground utilities by the parties on appeal, it is important to note that the Commission's decision on October 17 was correct. The Development Review Act, §45-23-45, states that
 "(a) Public design and improvement standards for development projects shall be specified, through reasonable, objective standards and criteria, in the design and improvement standards section of the local regulations. Appropriate public improvement standards shall be specified for each area or district of the municipality. Standards may include, but are not limited to, specifications for rights-of-way, streets, sidewalks, lighting, landscaping, public access, utilities, drainage systems, fire protection, and soil erosion control.
 (b) All public improvements required in a land development project or subdivision by a municipality shall reflect the physical character and design for that district which is specified by the municipality's adopted comprehensive plan. Public improvement requirements and standards need not be the same in all areas or districts of a municipality. The technical details of the improvement standards may be contained in an appendix to the local regulations but shall be considered part of the regulations." (Emphases added).
However, Charlestown's Ordinance does not specify any criteria for determining when electric, telephone, or other communications utilities must be underground. Rather, it vests complete discretion in the Planning Commission, stating only that "[u]nderground utilities are preferred, encouraged and may be required by the Planning Commission." Ordinance § 188-48.D.
[10] It was confirmed at the October 29, 2001 meeting that the subject pool was located on an adjacent parcel, and not applicant's property.
[11] The evidence as to the one access was addressed to the Planning Commission's discretionary authority to require two principal means of access for subdivisions of more than 15 lots. See Ordinance § 188-45.B.(6).
[12] Ordinance § 188-19.B.(5) provides that an environmental analysis address impacts made upon "public services," and § 188-19.D. provides that the environmental analysis include an analysis of the benefits and costs incurred by the municipality from a proposed development.
[13] Despite some of the commissioners' concerns, on December 12, 2001, that Beechwood's site plans did not adequately identiy certain land constraints, including slopes and contours, none of the commissioners cited this as a reason for denying subdivision approval. See infra. Perhaps this was because Beechwood provided additional maps at the next meeting, on January 3, 2002. Therefore, the zoning board properly did not consider these potential issues during its review.
[14] Notably, one of the issues that Beechwood raised on appeal before the zoning board was the administrative officer's failure to issue a default approval and to certify that the planning board had failed to act upon the application within 120 days, as it was required to do pursuant to G.L. § 45-23-41(f). Upon the planning board's failure to act within this time, the officer is obliged, by G.L. § 45-23-41(g), to issue a default approval "on request of the applicant." It was Beechwood's contention that the planning board did not expressly deny the application but, instead,failed to approve the application; Beechwood argued that a separate voteto deny the application was required. Because Beechwood has not briefed the issue on appeal to this Court, this Court does not decide the issue. Nevertheless, it is observed that the minutes of the vote indicate that the Board members and parties understood the vote to constitute a denial of the application. See, e.g., Record Exhibit 12, Planning CommissionMinutes, p. 6 (Jan. 10, 2002) (Bd. member Platner observing that time for action has run out, but that the application is incomplete); id. at 7-8 (Attorney Hogan, for applicant, requesting that the Commission reconsider its denial — to deny without prejudice — and motion to that end being denied). In fact, in its memorandum to the board of review, Carolina stated that "[w]hile Appellant recognizes that the intent of the
Commission may have in fact been to deny, the Commission's actions did not accomplish this result." Record, Exhibit 1, Beechwood Enterprises, Inc., Appeal to Zoning Bd. of Review, File No. 798 (1/31/02),"Statement of Appeal" at 2. (Emphasis added).
Further, because G.L. § 45-23-63(d) requires a majority vote toapprove a subdivision, the absence of a majority is a de facto denial.
[15] Item #17 of the Record also contains a group of site plans and maps the cover of which reads "Preliminary Plan for Carolina Farm A Major Subdivision in Charlestown, R.I." [hereinafter Plans Packet]. The "Site Plan," (Record, Item #17), indicates that Applicant proposed two primary streets, "Amber Way" and "Lunar Way". These would both be cul-de-sacs which share a common point. Amber Way begins at Route 112 (or, Carolina Back Road), runs somewhat circuitously at a northeasterly direction for a short distance, and then turns easterly. Lunar Way runs south/southwesterly. The Lots on the Plan are situated on the north side of Amber Way, the eastern side of Lunar Way, and in the area between the vertex of the two streets. The perimeter of the entire subdivision is reserved as open space. For convenience, a copy of the "Site Plan" is attached to this Decision.
Commissioner Arnold was concerned with whether the Town would be liable for maintaining the subdivision's proposed "Lunar Way." However, this was an improper basis for denial. General Laws, § 45-23-46(e) requires that subdivision regulations establish separate procedures for municipal acceptance of public streets. Where these procedures are employed, acceptance by the municipality functions as an acceptance "for maintenance and/or part of the municipal system." G.L. § 45-23-46(h).
[16] Beechwood properly contended that it could not be required to include underground utilities. See supra., n. 9. Thus, Beechwood argued, the inclusion of this improper condition could have influenced the Commissioners' votes. However, the record demonstrates that the condition would have worked in Beechwood's favor, if at all. Thus, the Board erroneously determined that this was a valid ground for reversal. Nevertheless, the Board was correct insofar as it concluded that the Commission could not require underground utilities. Id.
[17] A written decision by the planning commission is required by §45-23-63(a). See also Veronneau v. Cumberland Planning Bd. of Appeals,
2003 R.I. Super. Lexis 132 (Darigan, J.). Further, G.L. § 45-23-53(d) requires a majority vote of the planning commission for an application to be approved and, where approval is given, § 45-23-60 sets out a list of provisions that the planning board must address by making findings of fact in its written decision. Though the Development Review Act contains no provisions expressly stating that a denial must also include specific findings, our Supreme Court has consistently required that a municipal agency, when acting in a quasi-judicial capacity, must in its decision set forth findings of fact and reasons for the action taken. See, e.g.Ridgewood Homeowners Ass'n v. Mignacca, 813 A.2d 965, 977 (R.I. 2003);Sciacca v. Caruso, 769 A.2d 578, 585 (R.I. 2001). See also 5 Rathkopf,The Law of Zoning and Planning, § 91:14 (2002).
[18] Prior to 1992, the now repealed R.I.G.L. 1956 § 45-23-18
authorized that planning board of appeals "may reverse or affirm, wholly or partly, or may modify the decision appealed from and make such order, requirement, decision, or determination as ought to be made, and to that end shall have all the powers of the plan commission from whom the appeal was taken." Id.
[19] Our Supreme Court has defined the term "reasonably competent evidence" as "any evidence that is not incompetent by reason of being devoid of probative force as to the pertinent issues." Zimarino v. ZoningBoard of Review of Providence, 95 R.I. 383, 386, 187 A.2d 259, 261 (1963).
[20] It is the planning commission that is vested with regulatory responsibility regarding subdivision, pursuant to the Development Review Act, and which has the power to grant waivers and modifications relating to subdivision requirements. See G.L. § 45-23-62. However, the purpose of our statutes mandating planning commission action on subdivision proposals within a specified time, (see, e.g. §§ 45-23-40(e), 45-23-41(f)), "is to remedy indecision, protracted deliberations, and deliberate or negligent inaction on the part of the approving authorities." 5 Rathkopf, the Law of Zoning and Planning, § 91:7 (2002). The protections afforded by these statutes would be nil indeed if the zoning board were obligated to remand for additional findings each time a planning commission denies an application on a clearly erroneous basis while ignoring other issues, which may then be used by the commission as the basis for a further — perhaps erroneous — denial. The potential for abusive tactics intended to evade or impermissibly delay an applicant's right to approval of a fully conforming subdivision would be great.
[21] This statute avoids unfair surprise to an applicant who waives the right to Master Plan review. It is at Master Plan review that an applicant must provide the Commission with information on the environmental and topographical characteristics of the site, see G.L. §45-23-40(a)(2), and seek comments from local, state, and federal agencies. G.L. § 45-23-40(a)(3). If at this stage comments submitted by an agency, or other considerations, causes the Commission to require an environmental analysis or archaeological survey the applicant has an additional year in which to respond before it must submit a Preliminary plan. See § 45-23-40(g).
[22] Notably, though Commissioner Platner noted "the Town Police Chief's concern that the location of the proposed Amber Way was a public safety issue," she also concluded that the application would probably be approved if it were complete. (Minutes (Jan. 10, 2002)). Thus, she did not base her denial upon the traffic issue.
[23] Appellants also allege that, as reflected in the site plans, an abutting property owner has a tree in a position on her property such that the Amber Way entrance does not have a proper "sight triangle." The sight triangle section, Zoning Ordinance § 218-66 provides:
 "[o]n any corner lot and all street intersections, no structure, vegetation or item shall be erected or maintained between the height of three and ten feet above ground level within the triangle formed by two street lines and a third line joining points on the street lines twenty feet from the intersection of street lines."
The tree is depicted as being on Beechwood's "Entrance Plan for Amber Way," (Record, Item #6) as being 24" wide. Carolina Compact alleges that the tree is only fifteen feet from the Amber Way intersection, running parallel to Route 112. (Appellant's Memo. in Support of Appeal fromCharlestown Zoning Bd. of Review (Jan. 30, 2003)). As Beechwood observes in its memo, the entrance map shows that the proposed intersection of Amber Way and Route 112 lies beyond Beechwood's property line. (See
Record, Item #6). However, by using the corner of Appellant's property line as the intersection when determining the sight triangle, Carolina Compact misconceives the evidence. (See Appellant's Memo, insert between pages 26 and 27 (depicting alleged sight triangle with red highlighting)). Rather, because the state highway line — over which the tree is depicted as straddling — is 20 feet beyond the proposed intersection, it is not within the sight triangle. The true intersection where the sight triangle would be appropriate is at the curb cut of Route 112.
Notably, though, even if the tree were within the sight triangle, however, the Zoning Ordinance provides that no item shall be "erected ormaintained." (Emphasis added). Generally, only the owner of property in which a tree is found can be said to maintain it.
[24] Notably, while Commission Platner also mentioned that the buffer was "not a true audio or visual buffer," she also added that she did not believe the plan would be denied if the application was complete.